STATE of Indiana, Appellant–Plaintiff,

v.

Kerel L. SEABROOKS, Appellee–Defendant.

No. 71A05–0302–CR–74.

Court of Appeals of Indiana.

Feb. 26, 2004.

Rehearing Denied May 7, 2004.

Michael P. Rehak, South Bend, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Andrew A. Kobe, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

MATHIAS, Judge.

Kerel Seabrooks ("Seabrooks") was convicted of three counts of felony murder[1] in

---

1. Ind.Code §§ 35–42–1–1(2) (1998); 35–41– 2–4 (1998); 35–43–2–1 (1998).

St. Joseph Superior Court. Seabrooks appeals, raising the following restated issues:

I. Whether the trial court abused its discretion by admitting evidence in violation of Indiana Evidence Rules 403 and 404(b); and,

II. Whether the State presented sufficient evidence to support Seabrooks felony murder convictions.

Concluding the trial court properly admitted evidence and sufficient evidence was presented to support Seabrooks' convictions, we affirm.

### Facts and Procedural History

On the afternoon of September 13, 2000, eighteen-year-old Charity Payne ("Payne") was lost and driving up and down Walnut Street in South Bend, Indiana. During this misadventure, Payne repeatedly passed the address of 1718 South Walnut. Seabrooks, Ronald Carter ("Carter"), Tyrome Wade ("Wade"), and Phillip Stroud ("Stroud"), who resided in the Detroit area but currently were visiting this address, noticed Payne repeatedly passing by. Eventually, Stroud ventured onto the street and initiated a conversation with Payne.

Payne, who had never met Stroud previously, nevertheless invited Stroud into her car and began to discuss her ex-boyfriend, John Sears. Although Payne described her breakup with John Sears as amicable at trial, Payne inexplicably informed Stroud of the Sears family's wealth, the extravagances contained in the Sears' home, how John Sears had circumvented the Sears' home-alarm system while they were dating, the schedule of the Sears' cleaning service, the layout of the Sears' home, the location of the Sears' dogs, and the address of the Sears' home. Tr. pp. 221, 223, 224–27.

Stroud and Payne then proceeded to pick up Wade. Even after noticing Stroud was carrying a handgun, Payne made sure Stroud and Wade would be able to locate the Sears' home by driving the two past it. Tr. pp. 232–33. Before Stroud departed Payne's company, he informed her that he intended to burglarize the Sears' home. Tr. p. 235.

On the following morning, Stroud, Wade, Carter, and Seabrooks decided to burglarize the Sears' home. Tr. p. 251. The group took an acquaintance's car and, after several wrong turns and stopping at a gas station to buy gloves, then drove to the Sears' home. The group noticed three trucks parked near the residence and heard a generator as they pulled up to the residence.

The Sears had hired the Arndt Construction Company to build a loft in a barn that was located on their property, and Lynn Ganger, Corby Myers, and Wayne Shumaker were working on the loft at the time of the group's arrival. Despite the indication that people might be at the Sears' residence, Wade proceeded to knock on the door and received no answer. One of the construction workers approached Wade and Stroud and asked what they were looking for. Wade informed the worker that they had seen an ad for the sale of a car and the worker responded by noting that he did not believe a car was for sale.

Wade and Stroud returned to their car. The car began to pull away, but after moving a very short distance, Stroud put the car in park and said, "We can't let the man get the license plates." Tr. p. 663. Carter responded by noting, "Why not? We did nothing wrong." *Id.* Despite Carter's assertion that they had nothing to worry about, Stroud insisted that the group go back and tie up the workers. *Id.*

Stroud, Seabrooks, and Wade went into the barn, and Carter went around the barn

to make sure no one else was there. When Carter stepped back into the barn, Wade was duct taping the workers' arms and legs behind their back, and Seabrooks was going through the wallet of one of the workers. Tr. p. 670. Once the workers were face down on the ground, Stroud threw a shirt over one of the workers and shot him in the head. Subsequently, Stroud executed the remaining two workers.

Stroud then noted that as long as they were there, they might as well go into the house and burglarize it. Tr. pp. 700–01. Seabrooks brought a ladder from the barn to the side of the Sears' house. Wade and Stroud climbed the ladder, entered the upstairs window and returned with a suitcase full of jewelry and foreign currency.

After the group returned to South Bend, Seabrooks informed an acquaintance that he had burglarized a house and that Stroud had killed three people. Later that night, Seabrooks, Wade, and Carter returned to Detroit.

On February 15, 2001, the State charged Seabrooks by information with three counts of felony murder and one count of Class A felony burglary.[2] On December 11, 2002, a jury found Seabrooks guilty on all counts.[3] The trial court merged Seabrooks' burglary conviction into his felony murder convictions and sentenced him to three consecutive sixty-year sentences to be served in the Department of Correction. Seabrooks now appeals.

### I. The Admission of Evidence

Seabrooks asserts that the trial court violated Indiana Evidence Rules 403 and 404(b) when it allowed Carter to testify regarding Seabrooks' searching through a murder victim's wallet.

■ The admission of evidence is within the trial court's discretion, and its decisions are only reviewed for an abuse of that discretion. *Jones v. State*, 780 N.E.2d 373, 377 (Ind.2002). An abuse of discretion occurs if a decision clearly is against the logic and effects of the facts and circumstances before the court or if the court has misinterpreted the law. *State v. Willits*, 773 N.E.2d 808, 811 (Ind.2002). If the trial court abuses its discretion in admitting evidence, the defendant is not entitled to a new trial unless he or she demonstrates that the improperly admitted evidence contributed to his or her verdict. *Cook v. State*, 734 N.E.2d 563, 569 (Ind. 2000).

#### A. *Indiana Evidence Rule 403*

■ Indiana Evidence Rule 403 states: Although relevant, evidence may be excluded if its probative value is *substantially* outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence.

Ind. Evidence Rule 403 (2004) (emphasis added).

■ "All relevant evidence is 'inherently prejudicial' in a criminal prosecution, so the inquiry [pursuant to Evidence Rule 403] boils down to a balance of the probative value [of the proffered evidence] against the likely unfair prejudicial impact

---

2. Ind.Code § 35–43–2–1(2) (1998).

3. Stroud was convicted of three counts of felony murder pursuant to this incident and received the penalty of death; Wade and Payne each were convicted of three counts of felony murder. *State v. Stroud*, 71S00–0011–DP–00642; *State v. Wade*, 71A03–0212–CR–00425; Tr. p. 242. Carter entered into an agreement with the State. Pursuant to this agreement, Carter testified against his accomplices and pled guilty to three counts of felony murder in exchange for a fifty-five year sentence. Tr. pp. 709–10.

[of the proffered evidence]." *Carter v. State,* 766 N.E.2d 377, 382 (Ind.2002) (citing *Richmond v. State,* 685 N.E.2d 54, 55–56 (Ind.1997)). "When determining the likely unfair prejudicial impact, courts will look for the dangers that the jury will (1) substantially overestimate the value of the evidence or (2) that the evidence will arouse or inflame the passions or sympathies of the jury." *Id.* (citing *Evans v. State,* 643 N.E.2d 877, 880 (Ind.1994)).

In the case at bar, the testimony at issue is relevant because it demonstrates that Seabrooks was an active participant in the crime rather than a person who just happened to be in the wrong place at the wrong time. Also, there is little danger that Seabrooks' jury overestimated the value of this testimony or that this testimony aroused or inflamed the passions of his jury.

When the trial court admitted this testimony, it gave a limiting instruction stating:

> [Seabrooks] is not charged with going through somebody's wallet. And, under the law, [even if you believe the evidence] you can't use [the evidence] to say, well, that's a bad thing to do, and therefore I think its more likely that he did the other bad things he's charged with. You can't use that as saying he's a bad guy.

Tr. p. 672. The trial court's limiting instruction ameliorated any possible risk that the jury might apply this testimony improperly. More importantly, there is little possibility that the admission aroused or inflamed Seabrooks' jury's passions.

Seabrooks' jury was exposed to detailed evidence describing how the three construction workers were bound and executed. The comparatively benign act of going through someone's wallet must be viewed in tandem with the execution of three innocent people to gauge the prejudicial impact of the testimony. In light of the considerable disparity between the passion-invoking qualities of the two acts, it is implausible to believe that Seabrooks' jury's reaction to his act of going through a victim's wallet was not eclipsed completely by its exposure to the manner in which the victims were murdered.

For all of these reasons, Seabrooks has failed to demonstrate a likely prejudicial effect, much less a prejudicial effect "substantially" outweighing the probative value of the proffered testimony, and the trial court did not violate Evidence Rule 403.

## B. *Indiana Evidence Rule 404(b)*

Indiana Evidence Rule 404(b) states in part, "[e]vidence of other crimes, wrongs, or acts is not admissible *to prove the character of a person in order to show action in conformity therewith.*" Ind. Evid. Rule 404(b) (2003) (emphasis added). "The paradigm of such inadmissible evidence is a crime *committed on another day in another place,* evidence whose *only* apparent purpose is to prove the defendant is a person who commits crimes." *Swanson v. State,* 666 N.E.2d 397, 398 (Ind. 1996) (emphasis added). Pursuant to *Swanson,* Seabrooks' act of going through a victim's wallet "at the time and location" of the victims' execution does not fall within the parameters of Evidence Rule 404(b).[4] Consequently, Seabrooks' Evidence Rule 404(b) claim must be rejected.[5]

---

4. The pertinent inquiry is whether the testimony is irrelevant or prejudicial. *See Swanson,* 666 N.E.2d at 398. Our previous Evidence Rule 403 analysis of the testimony at issue answers this question.

5. Given the overwhelming independent evidence of guilt, had the trial court abused its discretion when it admitted the testimony, the admission would have been harmless error.

## II. Felony Murder

■ Seabrooks also challenges the sufficiency of evidence supporting his felony murder convictions. Specifically, Seabrooks asserts that the undisputed evidence reveals that the execution of the construction workers took place before the commission of the burglary supporting his felony murder conviction, which renders the burglary useless for the purpose of supporting the requisite underlying felony of felony murder.

■ Our standard of·review for sufficiency claims is well settled. In reviewing a claim of insufficient evidence, we will affirm the conviction unless, considering only the evidence and the reasonable inferences favorable to the judgment, and neither reweighing the evidence nor judging the credibility of the witnesses, we conclude that no reasonable fact finder could find the elements of the crime proven beyond a reasonable doubt. *Tyson v. State,* 766 N.E.2d 715, 717–18 (Ind.2002).

The relevant portion of Indiana's felony murder statute provides, "[a] person who knowingly or intentionally kills another human being while committing or attempting to commit ... burglary ... commits murder, a felony." Ind.Code § 35–42–1–1(2). Indiana's burglary statute requires the State to prove beyond a reasonable doubt that the defendant "[broke and entered a] building or structure of another person,

with the intent to commit a felony in it." Ind.Code § 35–43–2–1.

Seabrooks admits that there was a plan in place to burglarize the Sears' home before the three murders, but contends that the *actus reas* of the breaking and entering had not occurred until after the victims were 'murdered.[6] Br. of Appellant at 10. Seabrooks also contends that none of the statutory elements of burglary were completed before the murders took place. Br. of Appellant at 11.

■ However, for purposes of felony murder, the *actus reas* element of the underlying felony is not necessarily the critical factor when determining whether a murder was perpetrated during the commission of a felony. Rather, our supreme court has determined that the *mens rea* may be dispositive. *See Mahone v. State,* 541 N.E.2d 278, 280 (Ind.1989) ("intent" to commit robbery may be inferred from the theft that occurs "after" the killing, if the theft and killing are part of one "uninterrupted transaction"); *see also Burns v. State,* 722 N.E.2d 1243, 1245 (Ind.2000). Thus, a felony murder conviction may be had if a perpetrator kills an individual before committing burglary's lone *actus reas* element of breaking and entering.[7]

Seabrooks also suggests that (1) the intent of the group to burglarize was interrupted by the unexpected presence of the

6. Seabrooks was neither charged nor convicted of robbery. Consequently, robbery may not be used to support the requisite underlying felony of felony murder.

7. Because *Mahone* requires· an "uninterrupted transaction," the connection between an intent to burglarize and the murder is sufficient to sustain a conviction pursuant to *Mahone.* However, our opinion should not be interpreted as holding that *Mahone's* language must be construed so narrowly. Because Indiana Code section 35–42–1–1(2) includes the phrase "while *attempting* to

commit burglary," which is not a requirement that the State charge the defendant with attempted burglary, and because Indiana Code section 35–42–1–1(2)'s clear intent is to include deaths that are the direct result of the commission of its listed felonies, we believe that Seabrooks' entry onto the Sears' property with an intent to burglarize and the resulting deaths, which were a direct consequence of the activities in the attempted furtherance of the burglary, fall within *Mahone's* interpretation of Indiana Code section 35–42–1–1(2).

construction workers and (2) this intent was only revived after the murders, as evidenced by Stroud's subsequent notation that the group "might as well burglarize the house as long as they were there." Br. of Appellant at 10 (citing Tr. pp. 700–01). However, Seabrooks' assertion that this court should determine the group had no intent to burglarize before the commission of the murders is an invitation to reweigh the evidence, as there is ample evidence in the record that indicates the group, at the very least, revived its intent to burglarize well before the murders.

When Stroud and Wade got back in their car, the car did not leave the property; rather, Stroud stopped the vehicle very soon after it had started moving. *See* Tr. p. 663 (noting "we just pulled up a little bit."). More importantly, before the group left the vehicle, Carter informed them that they had not yet done anything wrong and there was no reason to go back and tie up the construction workers. *Id.*

The jury could more than reasonably infer from the group's rejection of Carter's statement that it was the group's intent to enrich themselves with the wealth of the Sears' home through burglary rather than the lone intent to murder the workers that motivated their actions upon leaving the car. *See Burns,* 722 N.E.2d at 1245 (applying the sufficiency standard to a defendant's claim that he committed the underlying felony of robbery after committing murder); *see also Mahone,* 541 N.E.2d at 280. As such, even if the group had reservations upon initially seeing the construction workers, there is ample evidence supporting the jury's determination that the group had an intent to burglarize upon leaving their car and this intent was contiguous to the murders.[8]

Because there is ample evidence of a strong connection between Seabrooks' intent to commit burglary and the commission of the murders, we will not impinge upon the province of the jury by reweighing the evidence.

## Conclusion

The trial court was within its discretion when it admitted testimony indicating that Seabrooks went through one of the victim's wallets and there was sufficient evidence presented to demonstrate an intent to burglarize contiguous to the commission of the three murders.

Affirmed.

SHARPNACK, J., and VAIDIK, J., concur.

---

8. We believe the dispositive issue is whether there was a connection between *"an* intent to burglarize" and the murder and not whether there was a connection between *"the first* formation of the intent to burglarize" and the murder. To hold otherwise would preclude the conviction of any felon who may have reconsidered committing the felony but eventually decided to proceed with the felony—which likely occurs often when a person decides to undertake such a perilous enterprise.