**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Apr 17 2012, 9:20 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**MICHAEL J. KYLE**
Baldwin Adams Knierim & Kamish, P.C.
Franklin, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**MARJORIE LAWYER-SMITH**
Special Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| CHARLES FREDERICK MILLER, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| vs. | ) | No. 41A01-1106-CR-250 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee. | ) | |

APPEAL FROM THE JOHNSON CIRCUIT COURT
The Honorable K. Mark Loyd, Judge
Cause No. 41C01-0910-FD-265

April 17, 2012

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**MATHIAS, Judge**

Charles Frederick Miller ("Miller") was convicted in Johnson Circuit Court of Class D felony auto theft. Miller appeals and raises the following restated arguments:

I. Whether the trial court abused its discretion by requiring Miller to remove his shirt in court in order to allow the jury to see his tattoos; and

II. Whether the State presented insufficient evidence to support Miller's conviction.

We affirm.

**Facts and Procedural History**

On August 30, 2009, Jeremy King ("King") was watching television alone in his home in Franklin, Indiana. Earlier that morning, King's girlfriend, Susan Chapman ("Chapman"), had borrowed one of King's vehicles for a trip out of town and left her truck in King's driveway for King to use. At around noon, King saw Chapman's truck moving down his driveway. King then jumped into another vehicle to chase after Chapman's truck, but by the time he began to proceed in that vehicle, he had lost sight of the truck. At the end of his driveway, King turned north onto U.S. 31 on "a hunch." Tr. p. 220. King then spotted the truck in the parking lot of the Hilltop Inn, which is located on U.S. 31 approximately one hundred yards north of King's residence. King pulled into the lot, where he saw a white man with a short, buzz-style haircut sitting inside the truck while one or two other people were loading items into the bed of the truck. King did not approach the driver, but he shouted for someone to call the police. At that time, the man in the truck pulled out of the parking lot and drove north on U.S. 31. King gave chase, but he lost sight of the truck when it turned west onto State Road 252. King followed the

2

truck onto State Road 252, and approximately one mile down the road, King saw that the truck was parked in a private driveway and that the driver had exited the vehicle and was attempting to open a gate to the property. When the driver saw King go by, he got back into the truck and headed east on State Road 252. By the time King was able to turn his vehicle around and catch up to the truck, the driver had abandoned it on the side of the road near a cornfield. The truck was still running, and the driver's side door was open. Additionally, there were boxes and totes in the bed of the truck that did not belong to King or Chapman. Some of the boxes were labeled "Chuck" and "Chuck's Cars." Tr. p. 376. King stayed near the truck while he waited for the police to arrive.

Meanwhile, Patty Meade ("Meade") and her sister were driving east on State Road 252, and passed Chapman's truck abandoned on the side of the road. They stopped in a parking area near the intersection of U.S. 31 and State Road 252, where Meade had arranged for her husband to pick her up. While they were waiting, Meade saw a man emerge from a nearby cornfield. At the same time, Meade saw her husband's car approaching, so she got out of the vehicle to remove her bag from the back of her sister's vehicle. At that time, the man from the cornfield approached her and stood "really, really close" to her and started "begging" for a ride to the Hilltop Inn. Tr. p. 239. The man was not wearing a shirt, and Meade noticed that he had a lot of tattoos on his neck, chest, and shoulders. Meade's husband then pulled up next to them and jumped out of his car. The man asked Meade's husband for a ride to the Hilltop Inn as well. When Meade and her husband refused the man's repeated requests for a ride, the man left.

3

When Meade and her husband drove away, they saw police near the truck on the side of the road and stopped to tell them about their encounter with the man. After Meade and her husband left, they spotted the man walking eastbound near U.S. 31 and called the police to report his location. Meade later identified Miller as the man who had approached her.

At around the same time, Summer Isley ("Isley") was alone at her parents' house, which is located nearby on U.S. 31. Isley heard movement outside, and when she went outside to investigate, she saw a shirtless, white male with a buzz-style haircut looking into her father's truck. The man had several tattoos on his neck, arms, and chest. Isley asked the man if she could help him, and he asked for a ride to the Hilltop Inn. Isley called her father, who told her not to give the man a ride. Isley told the man that he would have to wait for her parents to return home, and he then borrowed her cell phone to make a phone call before leaving the property. Isley later identified Miller as the man who came onto her parents' property.

Shortly thereafter, Clint Frost ("Frost") was in his home located on U.S. 31 in Franklin when he saw a shirtless man walking toward his house from a nearby creek. The man was white and had a lot of tattoos, and Frost saw that he was wet. The man introduced himself as "Chuck" and told Frost that he had lost his canoe in the creek. "Chuck" asked Frost for a ride to his grandfather's house in Taylorsville. Frost then drove the man to a home in Taylorsville and dropped him off. Frost later identified Miller as the man he had given a ride to Taylorsville.

4

Meanwhile, police used a canine officer to track the man from Isley's parents' property to Frost's property. When Frost returned to his home after dropping "Chuck" off in Taylorsville, several police officers were waiting for him. Frost described the man to the police and showed them where he had dropped him off. After discovering that Miller's last known address was a block away from where Frost had dropped the man off, police went to that address, but they did not find anyone there.

As a result of these events, the State charged Miller with Class D felony auto theft on October 19, 2009. A two-day jury trial commenced on April 25, 2011, at which King, Meade, and Frost testified for the State. Because Isley was experiencing complications with a pregnancy, the State presented her testimony through a video deposition without objection from Miller. The State also presented DNA evidence derived from swabs taken from the interior of Chapman's truck and a stick of deodorant found in one of the boxes left in the bed of the truck. Although Miller could not be conclusively identified as the source of the DNA, he could not be excluded either. Specifically, with respect to the sample taken from the interior of the truck, the combined probability of inclusion for the Caucasian population was one in 11,000, meaning that if 11,000 other Caucasians were randomly selected, one other person would be expected to be included in the mixture. Tr. p. 437. With respect to the sample taken from the stick of deodorant, the combined probability of inclusion for the Caucasian population was one in 110. At the conclusion of the trial, Miller was found guilty as charged. Miller now appeals.

5

# I. Admission of Evidence

On appeal, Miller argues that the trial court abused its discretion by requiring Miller to remove his shirt in court in order to allow the jury to see his tattoos. Specifically, he argues that requiring him to partially disrobe and expose his upper body to the jury was a violation of Indiana Evidence Rule 403, which provides that a trial court may exclude relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." However, Miller did not object at trial on Evidence Rule 403 grounds. Instead, he based his objection on assertions that being required to remove his shirt was "an unreasonable invasion of privacy" and an unlawful search. Tr. p. 245. It is well settled that a party may not object on one ground at trial and seek reversal on appeal using a different ground. Casady v. State, 934 N.E.2d 1181, 1191 (Ind. Ct. App. 2010), trans. denied. Miller's argument under Evidence Rule 403 is therefore waived.

Waiver notwithstanding, Miller would not prevail. The admission of evidence falls within the trial court's discretion, and its decisions are reviewed only for an abuse of discretion. State v. Seabrooks, 803 N.E.2d 1190, 1193 (Ind. Ct. App. 2004). An abuse of discretion occurs where the trial court's decision is clearly against the logic and effect of the facts and circumstances before the court, or if the court has misinterpreted the law. Id.

On appeal, Miller argues that the probative value of requiring him to remove his shirt and expose his upper body and tattoos to the jury was outweighed by the danger of unfair prejudice arising therefrom. As we explained above, Evidence Rule 403 provides that a trial court may exclude relevant evidence "if its probative value is *substantially* outweighed by the danger of *unfair* prejudice[.]" (emphases added). In a criminal prosecution, all relevant evidence is necessarily prejudicial. Seabrooks, 803 N.E.2d at 1193. Thus, the inquiry under Rule 403 boils down to a balance of the probative value of the proffered evidence against the danger of *unfair* prejudice resulting from its admission. Id. at 1193-94. The danger of unfair prejudice arises from the potential for a jury to substantially overestimate the value of the evidence, or its potential to arouse or inflame the passions or sympathies of the jury. Id.; Wages v. State, 863 N.E.2d 408, 412 (Ind. Ct. App. 2007), trans. denied. A trial court's decision regarding whether evidence violates Rule 403 is accorded a great deal of deference on appeal, and we review it only for an abuse of discretion. Tompkins v. State, 669 N.E.2d 394, 398 (Ind. 1996).

Here, the trial court required Miller to remove his shirt and expose his tattoos to the jury during Meade's testimony, after she had identified Miller and stated that he was shirtless during her encounter with him, and that she remembered his tattoos. Thus, the probative value of allowing the jury to see Miller's tattoos was considerable because it corroborated Meade's identification. And the probative value increased with Isley's and Frost's testimony, because both of their identifications of Miller were based partly on the presence of his tattoos.

7

We also conclude that the relative risk of unfair prejudice was low. Miller argues that the evidence created a risk of unfair prejudice because some individuals may associate tattoos with the rougher elements of society or disapprove of tattoos based on their social or religious views. However, the witnesses who identified Miller had already testified concerning his tattoos, and Miller did not object to removing his scarf to display at least some of his tattoos. Although some jurors may have had negative feelings about tattoos, in this case, reference to Miller's tattoos was simply unavoidable because they are by nature a major, identifying feature. And in any event, we believe that the risk that the simple fact that Miller had tattoos would so inflame the jurors' passions that they would be motivated to convict on that basis is remote.

Miller also argues that requiring him to remove his shirt in the presence of the jury created a risk of unfair prejudice because doing so was "disrespectful" toward Miller and disrupted the "normal and reasonable decorum of the courtroom[.]" Appellant's Br. at 9. According to Miller, unfair prejudice resulted because the jurors would not expect an innocent person to be forced to remove his shirt in a courtroom. We cannot agree. The jurors were already well aware that the State suspected Miller of committing a crime, and Miller was required to remove his shirt to allow a witness to identify him. Although it was arguably unusual for the trial court to require Miller to remove his shirt in front of the jury and doing so may have been awkward for him, we simply cannot conclude that it created such a danger of unfair prejudice as to substantially outweigh the probative value of the identification evidence. This is particularly true in light of the substantial

8

deference we afford the trial court with respect to conducting the balancing test of Evidence Rule 403. Accordingly, the trial court did not abuse its discretion by requiring Miller to remove his shirt in the presence of the jury.[1]

## II. Sufficiency of the Evidence

Next, Miller argues that the State presented insufficient evidence to support his conviction. In reviewing a challenge to the sufficiency of the evidence, we neither reweigh the evidence nor judge the credibility of witnesses. Atteberry v. State, 911 N.E.2d 601, 609 (Ind. Ct. App. 2009). Instead, we consider only the evidence supporting the conviction and the reasonable inferences to be drawn therefrom. Id. If there is substantial evidence of probative value from which a reasonable trier of fact could have drawn the conclusion that the defendant was guilty of the crime charged beyond a reasonable doubt, then the verdict will not be disturbed. Baumgartner v. State, 891 N.E.2d 1131, 1137 (Ind. Ct. App. 2008). Circumstantial evidence alone is sufficient to sustain a conviction, provided that inferences supporting the verdict may reasonably be drawn therefrom. Green v. State, 808 N.E.2d 137, 138 (Ind. Ct. App. 2004).

In order to convict Miller of Class D felony auto theft, the State was required to prove that Miller knowingly or intentionally exerted unauthorized control over Chapman's truck with the intent to deprive Chapman of the truck's value or use. See Ind. Code § 35-43-4-2.5 (2004); Appellant's App. p. 11. Miller argues that the State

---

[1] Miller notes that the State had a less intrusive means of introducing evidence of Miller's tattoos—taking photographs of them and admitting those photos into evidence. We agree that this would have been a better practice, but the fact that another method may have been less intrusive does not increase the danger of unfair prejudice resulting from the method used by the State.

presented insufficient evidence to prove that he ever had possession of Chapman's truck. We disagree.

The evidence favorable to verdict establishes that when King gave chase after seeing Chapman's truck leaving his driveway, he discovered the truck at the Hilltop Inn, which is approximately one hundred yards down the street from his home. One person, a white man with a short, buzz-style haircut, was inside the truck, and other people were loading items into the back of the truck. When King shouted for someone to call the police, the driver sped away with King in pursuit. After a short chase, the driver abandoned the truck on the side of the road. Very shortly after the truck was abandoned, Miller, a white man with a short, buzz-style haircut, approached three separate people in the area on foot. Miller asked each of these witnesses for a ride—and he specifically asked Meade and Isley for a ride to the Hilltop Inn. Miller identified himself to Frost as "Chuck," and boxes left in the back of the truck were labeled "Chuck" and "Chuck's Cars." Additionally, Miller could not be excluded as a contributor of the DNA evidence collected from the interior of the truck and from a stick of deodorant in one of the boxes. With respect to the sample taken from the interior of the truck, the combined probability of inclusion for the Caucasian population was one in 11,000, meaning that if 11,000 other Caucasians were randomly selected, one other person would be expected to be included in the mixture. Tr. p. 437. With respect to the sample taken from the stick of deodorant, the combined probability of inclusion for the Caucasian population was one in 110.

As our supreme court has noted, "[c]ircumstantial evidence by its nature is a web of facts in which no single strand may be dispositive. In a prosecution based on circumstantial proof, the evidence in the aggregate may point to guilt where individual elements of the State's case might not." Kriner v. State, 699 N.E.2d 659, 664 (Ind. 1998). That is certainly true of this case. Based on the foregoing evidence, we conclude that the State presented sufficient circumstantial evidence to establish that Miller had possession of Chapman's truck.

Miller also appears to argue that even if the State presented sufficient evidence to establish that he had possession of the truck at some time, it presented insufficient evidence that he is the individual who stole it. Miller correctly notes that mere unexplained possession of recently stolen property does not automatically support a conviction for theft. See Fortson v. State, 919 N.E.2d 1136, 1143 (Ind. 2010). Rather, the possession of recently stolen property should be "considered along with the other evidence in a case, such as how recent or distant in time was the possession from the moment the item was stolen, and what are the circumstances of the possession (say, possessing right next door as opposed to many miles away)." Id. The fact of possession and all the surrounding evidence must be assessed to determine whether any rational juror could find the defendant guilty beyond a reasonable doubt. Id.

In this case, the circumstances of Miller's possession of the truck clearly support a conclusion that Miller is the party who stole it. Although King was not able to identify Miller as the person he saw inside the truck at the Hilltop Inn, he testified that the driver

11

was a white man with a short, buzz-style haircut. And immediately after the vehicle was abandoned, Miller, who is white and has a short, buzz-style haircut, approached people in the area on foot and asked them for a ride to the Hilltop Inn. This evidence supports an inference that Miller was the driver King saw inside the truck, which in turn supports an inference that Miller had possession of the truck at the Hilltop Inn immediately after, and in the immediate vicinity of the theft. Miller's flight after King shouted for someone to call the police also points to a conclusion that Miller stole the truck. And Miller's repeated attempts to get out of the area as quickly as possible after the truck was abandoned by asking three strangers for a ride provides further support for the conclusion that Miller stole the truck. For all of these reasons, we conclude that the evidence, when viewed as a whole and most favorably to the verdict, supports Miller's conviction for Class D felony auto theft.

## Conclusion

Miller has waived his appellate argument that requiring him to remove his shirt in the presence of the jury violated Evidence Rule 403 and, waiver notwithstanding, his claim must fail. The State presented sufficient evidence to support Miller's conviction.

Affirmed.

FRIEDLANDER, J., and RILEY, J., concur.