**Jason Lamont WELLS, Appellant–Defendant,**

v.

**STATE of Indiana, Appellee–Plaintiff.**

No. 82A04–0803–CR–152.

Court of Appeals of Indiana.

April 7, 2009.

Transfer Denied June 25, 2009.

Matthew Jon McGovern, Evansville, IN, Attorney for Appellant.

Gregory F. Zoeller, Attorney General of Indiana, Ellen H. Meilaender, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

MATHIAS, Judge.

Jason Lamont Wells ("Wells") was convicted in Vanderburgh Circuit Court of Class C felony involuntary manslaughter as a lesser-included offense of the charged crime of murder. Wells appeals and presents three issues, which we restate as:

I. Whether the trial court erred in excluding evidence regarding prior conduct of the victim;

II. Whether the trial court erred in admitting into evidence Wells's statement to the police; and

III. Whether the trial court erred in imposing an eight-year sentence.

We affirm.

### Facts and Procedural History

In 2002, Wells was convicted of Class D felony drug crimes and eventually released from a "safe house" in 2003. While searching for employment, Wells met the victim in this case, John Carter ("Carter"). Carter was a maintenance man who was remodeling part of a hotel in Evansville, Indiana. Carter hired Wells to help him with the remodeling job. Carter also had a room at the hotel, where he and Wells lived together.

Carter and Wells became lovers who, according to Wells, had a "wild lifestyle" which included sadomasochistic behavior. Supp. Tr. p. 50. According to Wells, Carter was the dominant one in the relationship and told Wells to call him "daddy." *Id.* at 54. Carter even introduced Wells to others as his son. Wells described Carter as his "sugar daddy," who provided him with drugs and financial support. *Id.* at 30.

Carter and Wells were both described as controlling of the other, and the pair frequently argued and fought each other, but without weapons. Yolinda Brooks, a worker at the hotel, had seen Carter looking as if he had been beaten up after she heard him and Wells arguing. Approximately one month before the instant offense, Ms. Brooks saw that Carter had been badly beaten, with swollen eyes and a bloody mouth. Usually after his fights with Carter, Wells would leave for a few days but eventually come back.

In the early morning hours of October 3, 2006, Wells and Carter were working at the hotel and began to argue when Carter wanted Wells to continue working, but Wells wanted to stop. Wells went back to their motel room, and Carter followed him a short time later. Wells eventually came to the motel lobby, where Ms. Brooks noticed that he had a large laceration over his eye and blood on his arm. Wells expressed surprise and anger that Carter had caused the cut on his eye and stated, "the mother f* * *er," meaning Carter, "was going to get it for doing that to him." Tr. p. 121. Wells then left the lobby and went back to the hotel room.

According to Wells, he and Carter got into a fight in which they both punched each other. At some point, Wells threw a mirror at Carter. In response, Carter charged him and began to choke him. Wells picked up a knife and a straight razor. Wells stated that everything "happened so fast" and stated that he thought he had only "sliced" Carter. Supp.Tr. pp. 33–34. Unfortunately for Carter, Wells had instead stabbed him in the chest with the knife. The stab wound was two to three inches deep and went through Carter's right lung and penetrated his heart. This caused massive bleeding into the

chest cavity. In addition to the stab wound, Carter had abrasions and contusions to his face, neck, and chest and defensive wounds on his hands.

A short time after he left the lobby, Wells called Ms. Brooks and told her to come to the room because "it was bad." Tr. p. 78. Ms. Brooks was scared and called the police. When she arrived at the hotel room, the door was cracked, and Wells told her to come in. Ms. Brooks saw Carter kneeling down motionless by the side of the bed. Although Carter appeared to be dead, Wells, in an apparent attempt to revive him, slapped Carter in the face, saying, "Dad, Dad." Tr. p. 87. When the police arrived at the hotel room, they found two knives, both of which had Carter's blood on them.

The police interrogated Wells regarding Carter's death. Wells waived his Miranda rights and spoke to the police. On October 4, 2006, the State charged Wells with murder. On December 10, 2007, Wells filed a motion to suppress his statement to the police, claiming that his waiver of his Miranda rights was involuntary due to police coercion and drug use. The trial court denied this motion.

A jury trial was held on December 17 through 20, 2007. During the trial, Wells offered the testimony of Christopher Sadler, who had formerly worked for Carter. During an offer of proof, Sadler stated that, while he worked for Carter, Carter physically abused him and forced him to be a "sexual slave." Tr. p. 553. Sadler stated that he was unsuccessful in his attempts to escape from Carter until he brandished a dagger and forced Carter to take him home. The trial court excluded this evidence. At the conclusion of the trial, the jury found Wells guilty of the lesser-included offense of Class C felony involuntary manslaughter.

At a sentencing hearing held on February 14, 2008, the trial court found as aggravating that Wells had a criminal history and that he was on probation at the time that he committed the instant offense. The trial court rejected Wells's proffered mitigating circumstances and sentenced Wells to the maximum sentence of eight years. Wells now appeals.

## I. Exclusion of Evidence

Wells first claims that the trial court erred in excluding the testimony of Sadler, Carter's alleged former victim. Questions regarding the admission of evidence are within the sound discretion of the trial court, and we review the court's decision only for an abuse of that discretion. *State v. Seabrooks,* 803 N.E.2d 1190, 1193 (Ind.Ct.App.2004). A trial court abuses its discretion only if its decision is clearly against the logic and effect of the facts and circumstances before it, or if the court has misinterpreted the law. *Id.*

As explained above, Sadler testified during an offer of proof that when he worked for Carter, Carter physically abused him and forced him into sexual acts. This abuse stopped only when Sadler threatened Carter with a dagger. The trial court excluded this evidence under Indiana Evidence Rule 404(b), which provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pre-trial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

Here, the trial court applied Evidence Rule 404(b) to exclude evidence regarding the prior conduct of the victim, not the defendant. Our supreme court addressed the applicability of Evidence Rule 404(b) to those other than the defendant in *Garland v. State,* 788 N.E.2d 425 (Ind.2003). Because the traditional purpose of Evidence Rule 404(b) has been to protect a defendant from being convicted based on unrelated prior bad acts, early efforts to use this rule to exclude evidence about the prior bad acts of non-defendants were rejected. *Id.* at 428–29 (citing *United States v. Morano,* 697 F.2d 923, 926 (11th Cir. 1983)). Later courts began to apply "reverse 404(b)" to the bad acts of non-parties where evidence of someone else's conduct tended to negate the defendant's guilt. *Id.* at 429.

Disagreeing with both of these approaches, the *Garland* court wrote, "the cleanest way of thinking of 404(b) in this context is a little different." *Id.* The court explained: "First, the text of Rule 404(b) is such that it governs evidence about acts by defendants, and non-defendants. Second, the rule acts as an appropriate restraint on admissibility of evidence about events or acts that are by definition largely extraneous to those for which a defendant is on trial." *Id.* However, for evidence about the bad acts of a non-defendant to be admissible, one of the exceptions of Rule 404(b) must apply. *Id.* at 430.

In the present case, Wells claims that Sadler's proffered testimony should have been admissible to prove Carter's motive and intent, which are exceptions listed in Rule 404(b). As explained by Wells's trial counsel: "The point of the offer to prove is to show [Carter's] motive and intent to act as he did which tends to corroborate [Wells's] testimony that [Carter] acted as he did by hitting him, charging at him, throwing him around the room, just as happened to Chris Sadler[.]" Tr. p. 572. In other words, Wells wanted to prove that Carter's behavior toward Sadler was the same or similar to Carter's behavior towards Wells. This is exactly what Evidence Rule 404(b) was designed to prevent, i.e. using proof of someone's crimes, wrongs, or acts to prove the character of a person in order to show action in conformity therewith. Although Wells claims he wanted to introduce Sadler's testimony to show Carter's motive and/or intent, it is clear that what he really wanted to do was show that Carter had committed a prior bad act and that he was therefore more likely to have committed similar bad acts on Wells. Thus, we cannot say that the trial court abused its discretion in concluding that Sadler's proffered testimony was inadmissible.

■■■■ Wells also claims that Sadler's testimony should have been admitted to show Carter's *modus operandi.* "The identity exception to [Rule 404(b) ] is crafted primarily for 'signature' crimes with a common *modus operandi.* The exception's rationale is that the crimes, or means used to commit them, were so . . . unique that it is highly probable that the same person committed all of them." *Thompson v. State,* 690 N.E.2d 224, 234 (Ind.1997). The test is whether the crimes are "strikingly similar." *Garland,* 788 N.E.2d at 431.

First, we fail to see why the identity exception would be applicable here, where Carter's identity was not an issue at trial. Moreover, we are unable to say that Carter's behavior towards Sadler was "strikingly similar" to his behavior toward Wells. Carter and Wells appear to have had a consensual, if deviant, relationship. Wells had a history of leaving Carter only to return, and there was evidence that Wells had physically assaulted Carter in the past. In contrast, Sadler stated that

Carter held him against his will, that Carter physically and sexually abused him, and that he was only able to escape when he threatened Carter with a weapon. Given these differences, the trial court did not abuse its discretion in concluding that Sadler's proffered testimony did not fall within the identity exception to Evidence Rule 404(b).[1]

## II. Admission of Evidence

■ Wells next claims that the trial court erred in admitting into evidence his statement to the police following Carter's death. As noted previously, we review the trial court's rulings regarding the admission of evidence only for an abuse of discretion. *Seabrooks*, 803 N.E.2d at 1193. Wells claims that his waiver of his Miranda rights was involuntary based upon the manner in which his waiver was procured. Specifically, he claims that the detective's statement effectively ordered him to sign the waiver. He also claims that the fact that he was under the influence of narcotics vitiates his waiver of his rights.

■■ It is the State's burden to prove by a preponderance of the evidence that a defendant's statement was voluntary. *Pruitt v. State*, 834 N.E.2d 90, 114 (Ind. 2005).[2] In evaluating a claim that a statement was not given voluntarily, the trial court is to consider the totality of the circumstances, including the crucial element of police coercion, the length of the interrogation, its location, its continuity, the defendant's maturity, education, physical condition, and mental health. *Id.* at 115. On appeal, we do not reweigh the evidence but instead view the evidence most favorable to the State, together with the reasonable inferences that can be drawn therefrom, in order to determine if there is substantial, probative evidence of voluntariness. *Id.* If there is substantial evidence to support the trial court's conclusion, it will not be set aside. *Id.*

Here, a review of the evidence favorable to the State reveals that there was substantial evidence of probative value supporting the trial court's conclusion that Wells voluntarily waived his Miranda rights and that his statement was voluntarily given. At the beginning of the interrogation, Detective Keith Whitler explained to Wells that he was under arrest on an outstanding warrant and was also under suspicion for homicide. Detective Whitler told Wells that he was going to read him his rights and wanted him to fully understand his rights. After reading the Miranda advisement to Wells, Detective Whitler asked Wells if he understood his rights and handed him the written advisement and asked him to read it for himself. Whitler then told Wells, "after

---

1. Wells argues that the trial court's exclusion of Sadler's testimony deprived him of his constitutional right to present a defense. To be sure, every defendant has the fundamental right to present witnesses in their own defense. *Roach v. State*, 695 N.E.2d 934, 939 (Ind.1998). Yet this right is not absolute. *Id.* "'In the exercise of this right, the accused, as is required of the State, must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence.'" *Id.* (quoting *Chambers v. Mississippi*, 410 U.S. 284, 302, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973)). The exclusion of Sadler's testimony was pursuant to a well-

established rule of evidence, and we cannot conclude that this violated Wells's right to present a defense.

2. Our supreme court has held that the Indiana Constitution requires the State to prove beyond a reasonable doubt that the defendant voluntarily waived his rights and that his confession was voluntarily given. *Id.* at 114–15. Wells does not develop a separate argument based on the Indiana Constitution, and we therefore only address his argument under the federal Constitution. Furthermore, the State presented evidence which met even this more stringent standard.

you've read [the advisement of rights form], we will talk about any one that you want to talk about. If you want to talk to me, I need you to sign right down there where it says you've waived those [r]ights, okay?" Supp. Tr. p. 5. When Wells asked what rights he would be waiving, Detective Whitler explained, "Basically since you're under arrest for this warrant, for me to talk to you, you're going to have to waive your rights and talk to me, okay?" Id. Shortly thereafter, Detective Whitler told Wells, "What I want you to do, if you want to talk to me, I need you to sign right there that you will talk to me, and then we'll go on from there." Id. at 6. The detective then offered to read the advisement of rights to Wells again and again asked him if he understood his rights.

We acknowledge that, taken wholly out of context, Detective Whitler's statement to Wells that "you're going to have to waive your rights," might seem to indicate that Wells was being ordered to waive his rights. But when the statement is viewed in its full context, it is clear that the detective was trying to explain to Wells, albeit inartfully, that before the police could ask him about Carter's death, Wells would have to agree to waive his Miranda rights. And this was true because Wells was in custody and was being interrogated regarding Carter's death. *See Lamonte v. State*, 839 N.E.2d 172, 175 (Ind.Ct.App. 2005) (noting that Miranda rights apply to custodial interrogations). We cannot say that the trial court erred in concluding that Wells was not ordered to waive his Miranda rights.

Wells also argues that his statement was involuntary because he indicated during the interrogation that he had taken two or three "Lortabs" two or three hours earlier. If the voluntariness of the defendant's statement is challenged on the basis that the defendant was under the influence of drugs, the defendant has the burden to introduce evidence from which it could be concluded that the amount and nature of the drug consumed would produce an involuntary statement. *Pruitt*, 834 N.E.2d at 115. The mere fact a statement is made by the defendant while under the influence of drugs, or that the defendant is mentally ill, does not render it inadmissible *per se*. *Id.* Intoxication and drug use are only factors to be considered by the trier of fact in determining whether a statement was voluntary. *Id.*

Wells presented no evidence to the trial court regarding the nature of Lortab. The testifying detective did indicate that Lortab was the same as hydrocodone.[3] However, Wells did not show how the amount and nature of the drug he consumed would have affected him in such a way as to render his statement involuntary. As noted by the State, a review of Wells's statement to the police indicates that he was lucid, coherent, and gave logical responses to the questions asked. He even tried to present the facts in a manner that would lessen his culpability for Carter's death. Under the totality of the circumstances, we cannot conclude that the trial court erred in determining that Wells voluntarily waived his Miranda rights and that his statement to the police was voluntary. *See Pruitt*, 834 N.E.2d at 115–16 (holding that defendant's statement to the police was voluntary even though it occurred after the defendant had undergone surgery, was in the intensive care unit, and had been given several doses of morphine).

---

3. The State notes in its brief that Lortab is a combination of acetaminophen, i.e. Tylenol, and hydrocodone.

## III. Sentencing

 Lastly, Wells claims that the trial court erred in sentencing him to the maximum term of eight years. In support of his argument, Wells claims that the trial court relied on an improper aggravating factor and failed to recognize a mitigating factor. Sentencing decisions rest within the sound discretion of the trial court. *Anglemyer v. State*, 868 N.E.2d 482, 490 (Ind.2007), *clarified on reh'g*, 875 N.E.2d 218. An abuse of discretion occurs if the trial court's decision is clearly against the logic and effect of the facts and circumstances before the court, or the reasonable, probable, and actual deductions to be drawn therefrom. *Id.* at 491. As explained in *Anglemyer*, a trial court can abuse its sentencing discretion in a number of ways, including: (1) failing to enter a sentencing statement at all; (2) entering a sentencing statement that explains reasons for imposing a sentence where the record does not support the reasons; (3) entering a sentencing statement that omits reasons that are clearly supported by the record and advanced for consideration; and (4) entering a sentencing statement in which the reasons given are improper as a matter of law. *Id.* at 490–91.

 Wells claims that the trial court relied upon an improper aggravating factor when it considered his criminal history. As noted by the State, the fact that a defendant has "a history of criminal or delinquent behavior" is a proper, statutory aggravating factor. Ind.Code § 35–38–1–7.1(a)(2) (2004 & Supp.2008). Wells does not deny that he has a criminal history but instead claims that his criminal history is relatively minor and should not be considered "weighty." A trial court no longer has any obligation to "weigh" aggravating and mitigating factors under *Anglemyer*. When imposing sentence under the post-*Blakely* sentencing regime, "a trial court cannot now be said to have abused its discretion in failing to 'properly weigh' such factors." *Anglemyer*, 868 N.E.2d at 491.

The record shows that Wells had been convicted of misdemeanor possession of marijuana in 2001, 2002, and 2004. Wells was also convicted of Class D felony maintaining a common nuisance in 2002 and Class D felony possession of a controlled substance in 2004. We therefore cannot say that the trial court abused its discretion in considering Wells's criminal history as an aggravating circumstance.

Wells claims that the trial court improperly failed to consider as a mitigating factor that Carter facilitated the offense. *See* I.C. § 35–38–1–7.1(b)(3) (stating that the court may consider as a mitigating circumstance that the victim of the crime induced or facilitated the offense). In *Cloum v. State*, 779 N.E.2d 84, 89 (Ind.Ct.App.2002), the defendant claimed that the trial court improperly ignored his proffered mitigators that the victim had induced or facilitated the offence and that he had acted under strong provocation. The court held that even if the defendant had been provoked or the victim had facilitated the offense, the trial court could properly ignore this proffered mitigator:

> We have previously held ... that "it would contravene clear legislative intent to hold that a person convicted of voluntary manslaughter is entitled to double mitigation of his sentence, once by being convicted only of voluntary manslaughter instead of murder and again by use of the 'strong provocation' statutory mitigator."

*Id.* (quoting *Jimmerson v. State*, 751 N.E.2d 719, 725 (Ind.Ct.App.2001)). Because Cloum's argument regarding the victim's inducement or facilitation and his provocation were virtually identical, the court concluded that the trial court did not

err in failing to mention these proffered mitigators, including the facilitation of the victim. *Id.* Thus, the *Cloum* court extended the holding of *Jimmerson* to include not only the provocation mitigator, but also the inducement or facilitation mitigator.

Here, Wells was charged with murder but convicted of the lesser-included offense of involuntary manslaughter. Obviously, the jury considered Carter's role in his own death when it decided to find Wells guilty of involuntary manslaughter instead of murder. Under *Cloum,* then, the trial court could properly ignore the proffered mitigator of the victim's facilitation because such would amount to "double mitigation." *See id.*

Moreover, even if *Cloum* were inapplicable, we would still conclude that the trial court did not err in failing to consider that Carter facilitated the offense. Wells argued at the sentencing hearing that Carter facilitated the offense by providing Wells with drugs, providing him with the room, and by "demanding" that Wells maintain their relationship. Wells's argument in this regard, however, views the facts in the light most favorable to him. The trial court was under no obligation to do the same.

Furthermore, we are unable to conclude that Carter's acts of providing Wells with a hotel room and drugs is clear evidence that he facilitated his own death. The same is true of the status of Carter and Wells's relationship. Encouraging someone to maintain a romantic or sexual relationship is not clear evidence of facilitation of involuntary manslaughter. Although a different trial judge might have come to a different conclusion than did the trial judge here, we cannot say that the evidence of facilitation was clearly supported by the record such that the trial court abused its discretion in failing to consider this as a mitigating factor.

Finally, Wells claims that his sentence is inappropriate. Pursuant to Indiana Appellate Rule 7(B), this court may revise a sentence otherwise authorized by statute if, after due consideration of the trial court's decision, we find that the sentence is inappropriate in light of the nature of the offense and the character of the offender. On appeal, it is the defendant's burden to persuade us that the sentence imposed by the trial court is inappropriate. *Childress v. State,* 848 N.E.2d 1073, 1080 (Ind.2006).

Wells specifically argues that his maximum eight-year sentence is inappropriate. The maximum possible sentences are generally most appropriate for the worst offenders. *Buchanan v. State,* 767 N.E.2d 967, 973 (Ind.2002). This is not, however, an invitation to determine whether a worse offender could be imagined, as it is always possible to identify or hypothesize a significantly more despicable scenario, regardless of the nature of any particular offense and offender. *Id.* In stating that maximum sentences are ordinarily appropriate for the worst offenders, we refer generally to the class of offenses and offenders that warrant the maximum punishment. *Id.* But this encompasses a considerable variety of offenses and offenders. *Id.* We concentrate less on comparing the facts of this case to others, whether real or hypothetical, and more on focusing on the nature, extent, and depravity of the offense for which the defendant is being sentenced, and what it reveals about the defendant's character. *Brown v. State,* 760 N.E.2d 243, 247 (Ind.Ct.App.2002), *trans. denied.*

Regarding the nature of the offense, we would note that Wells stabbed his admitted lover and partner in the chest with a knife. The knife penetrated Carter's heart and lung, causing massive internal

bleeding. Regardless of the somewhat unusual nature of their relationship, Carter provided Wells with a job and a place to stay. When the two fought in the past, it was Carter, not Wells, who was seen looking as if he had been beaten up.

Wells now claims that his fight with Carter was "mutual" and that he was provoked. We do not deny that it appears that Carter and Wells got into a physical altercation. Wells was seen with a cut on his eye which was apparently caused by Carter during their fight. However, instead of leaving the hotel or calling the police, Wells stated, "the mother f* * *er," i.e., Carter, "was going to get it for doing that to him." Tr. p. 121. Thus, Wells went back to the hotel room with the intention of exacting revenge upon Carter. And Wells escalated the nature of the fight by using a deadly weapon.

Wells also claims that we should take into consideration that he did not flee and made resuscitation attempts on Carter. As the State notes, however, there was also evidence that, when the police arrived, Wells had packed a bag and called a friend to come get him. This would suggest that Wells was considering fleeing before the police arrived.

Considering the nature of Wells's character, we note that he has a criminal history which is not insubstantial. Since 2001, Wells has accumulated three misdemeanor convictions and two felony convictions. Wells has been given probation in the past only to have such probation revoked, and was on probation at the time he committed the instant offense. This does not speak well of his character. Furthermore, while he was on probation, Wells admittedly used illicit drugs and committed the instant offense. Clearly Wells has not chosen to modify his behavior to conform with the law despite the lenience that has been shown to him. Instead, Wells continued to use drugs and got into a violent, volatile relationship with Carter which ultimately led to Carter's death.[4]

Under these facts and circumstances, and giving due consideration to the trial court's decision, as we must, we cannot say that Wells's eight-year sentence is inappropriate. Although we might be able to imagine a worst offense or offender, this is not the relevant question. *See Buchanan,* 767 N.E.2d at 973; *Brown,* 760 N.E.2d at 247. The trial court's imposition of the maximum sentence in this case was not inappropriate.

### Conclusion

The trial court did not abuse its discretion in excluding Sadler's testimony under Evidence Rule 404(b). Nor did the trial court abuse its discretion when it admitted into evidence Wells's statement to the police, because the State established that Wells voluntarily waived his Miranda rights and voluntarily spoke with the police. Lastly, the trial court did not err in imposing an eight-year sentence.

Affirmed.

BAILEY, J., and BARNES, J., concur.

---

4. Although Wells now claims that he was remorseful, it is well established that the trial court is in the best position to determine whether a defendant is truly remorseful. *See Corralez v. State,* 815 N.E.2d 1023, 1025 (Ind. Ct.App.2004). The trial court here did not consider Wells's remorse to be a mitigating factor, and we see no reason to question this decision.