Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



ATTORNEYS FOR APPELLANT:

**DONALD R. SHULER**
Barkes, Kolbus, Rife & Shuler, LLP
Goshen, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**KATHERINE MODESITT COOPER**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| JOSEPH K. BUELNA, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 20A04-1305-CR-223 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE ELKHART SUPERIOR COURT
The Honorable Thomas J. Ryan, Judge
Cause No. 20D03-0810-FA-52

**January 30, 2014**

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**MATHIAS, Judge**

Following a jury trial, Joseph K. Buelna ("Buelna") was convicted in Elkhart Superior Court of Class A felony manufacturing methamphetamine and sentenced to fifty years in the Department of Correction, with twenty years of that sentence suspended. Buelna appeals and presents three issues for our review:

I. Whether the trial court erred in admitting evidence found in a warrantless search;

II. Whether the State presented evidence sufficient to support Buelna's conviction; and

III. Whether the sentence imposed by the trial court is inappropriate in light of the nature of the offense and the character of the offender.

We affirm.

**Facts and Procedural History**

Phil Miller ("Miller") purchased a house in Goshen, Indiana that had been repossessed. Miller planned to refurbish and resell the house. As the house was vacant, Miller boarded it up to prevent damage to the windows. Miller hired Nathan Slabach ("Slabach") to work on a detached garage adjacent to the house. Slabach later informed Miller that he hired the defendant in this case, Buelna, as a subcontractor. Although Miller saw Buelna working with Slabach, he never actually met Buelna, nor did he ever give him permission to stay at the house when not working. He did, however, give Slabach permission to keep some tools at the property. Despite not having permission to do so, Slabach began to stay overnight at the house. He even kept a television and a few chairs at the house. While there, he and Buelna also began to manufacture methamphetamine.

2

One of Buelna's friends, Kammi Pantoja ("Pantoja") visited Buelna at the house owned by Miller approximately ten times in two weeks and used methamphetamine with Slabach and Buelna. Although the three would stay at the house through the night, they did not sleep and instead smoked methamphetamine. On October 13, 2008, Pantoja went to the home to smoke methamphetamine. When she arrived, Buelna and Slabach were "cooking dope." Tr. p. 642. Thereafter, Pantoja left with Slabach and drove to another town, leaving Buelna alone for a few hours.

In the meantime, the police received a call from a concerned citizen informing them of the manufacture of methamphetamine at the house. The caller told the police that (s)he had entered the attic of the house and had seen items used to manufacture methamphetamine, including chemicals, buckets, and bottles with tubing. In response to this call, Elkhart Police Department Corporal Jeff Eaton arrived at the scene at approximately 9:30 p.m. and noted the odor of ammonia, which he associated with the manufacture of methamphetamine. Detective Tim Freel arrived shortly thereafter and also noticed the odor. Detective Freel also observed that the house appeared to be vacant and under some construction.

The officer first went to the front door, but noticed through a window that a board had been set up beneath the doorknob inside the home to barricade the door. They then went and knocked on the back door, announcing "police," several times, but no one answered. Tr. p. 116. As they went to the back of the house, the odor of ammonia became very intense. They also observed another board inside the home barricading the back door. They then saw a ladder leaning against the house leading to a second-story

3

window covered by a blue tarp. Inside the window was a light, and the officers could see the shadow of a person inside.

Before climbing up the ladder, the officers called the police department because of the strength of the ammonia smell. As Detective Freel climbed the ladder, the smell of ammonia became so strong that his eyes began to water, and he was in a great deal of discomfort. He also heard a noise come from inside the window, leading him to believe that someone was inside. When Detective Freel got to the roof, the wind had blown back part of the tarp covering the window. Inside, he saw Buelna sitting at a desk and hiding his hands behind a countertop. Detective Freel drew his sidearm and ordered Buelna to show his hands. Buelna began to do so but then turned and ran to the other end of the attic. Detective Freel caught Buelna and handcuffed him.

Inside the attic, the officers discovered a "one-pot" methamphetamine lab in the middle of the floor. The chemical smell was so strong that Detective Freel eyes watered profusely, his throat burned, and he even had difficulty breathing. A search of the house revealed no one else other than Buelna. The police then contacted the owner of the house, Miller, who arrived at the scene approximately an half-hour later. Miller was not sure who exactly Buelna was, but did say that he had seen him with Slabach. Miller gave the police permission to search the property.

Inside the attic, the police found two reaction vessels, a pot, eight used reaction vessels, pseudoephedrine, several hydrochloric acid generators, lithium batteries, a coffee grinder, coffee filters, salt, cold packs, a fuel tank, and a pink plastic purse which contained pseudoephedrine and zip-top bags. Inside the zip-top bags were coffee filters

4

containing a white residue. Also inside the attic was a television, a stolen handgun, and lawn chairs. The one-pot lab had materials in it undergoing a chemical reaction and bubbling. One of the other reaction vessels contained a mixture of ephedrine and pseudoephedrine, and the other held a liquid containing methamphetamine. The liquid in the reaction vessel was determined to weigh approximately thirteen grams.

As a result, the State charged Buelna on October 17, 2008, with Class A felony manufacturing methamphetamine and Class B felony burglary. The State later amended the charging information to allege the use of a firearm during the commission of a controlled substance offense and alleged that Buelna was an habitual offender. On March 8, 2011, Buelna filed a motion to suppress the evidence seized during the search of the attic. Buelna claimed that Slabach had been treating Miller's property as his residence and that, as Slabach's guest, he had standing to challenge the search of the property. The trial court disagreed and concluded that Buelna lacked standing to challenge the search and further concluded that, even if Buelna did have standing, the warrantless search was justified by exigent circumstances.

Buelna's jury trial began on August 22, 2012. On August 24, 2012, the jury found Buelna guilty of Class A felony manufacturing methamphetamine but acquitted him of the charge of burglary. The State then dismissed the allegation regarding the use of a handgun and the habitual offender enhancement. At a hearing held on September 13, 2012, the trial court imposed a sentence of fifty-years, with thirty years executed and twenty suspended. Buelna now appeals.

## I. Admission of Evidence Seized During Warrantless Search

Buelna claims that the trial court abused its discretion when it admitted into evidence the items seized during the warrantless search of Miller' house. When a defendant challenges the propriety of a search following a completed trial, the issue is one of whether the trial court properly admitted the evidence. Casady v. State, 934 N.E.2d 1181, 1188 (Ind. Ct. App. 2010). Questions regarding the admission of evidence are left to the sound discretion of the trial court, and we review the court's decision on appeal only for an abuse of that discretion. Fuqua v. State, 984 N.E.2d 709, 713-14 (Ind. Ct. App. 2013), trans. denied. The trial court abuses its discretion only where its decision regarding the admission of evidence is clearly against the logic and effect of the facts and circumstances before it, or if the court has misinterpreted the law. Id. Regardless of whether the challenge is made through a pretrial motion to suppress or by an objection at trial, our review of rulings on the admissibility of evidence is essentially the same: we do not reweigh the evidence, and we consider conflicting evidence in a light most favorable to the trial court's ruling, but we also consider any undisputed evidence that is favorable to the defendant. Id.

Subject to a few specifically established and well-delineated exceptions, searches performed by government officials without warrants are *per se* unreasonable under the Fourth Amendment. Holder v. State, 847 N.E.2d 930, 935 (Ind. 2006) (citing Katz v. United States, 389 U.S. 347, 357 (1967)). A warrantless search requires the State to prove the existence of an exception to the warrant requirement applicable at the time of the search. Id. But to trigger the protections of the Fourth Amendment, the search must

arise out of an intrusion by a government agent upon an area in which the person maintains a reasonable expectation of privacy. Id. (citing Katz, 389 U.S. at 360). Accordingly, whether Fourth Amendment protections should be applied embraces a two-part inquiry: (1) whether a person has exhibited an actual subjective expectation of privacy; and (2) whether the expectation is one that society is prepared to recognize as reasonable. Id. at 936 (citing Katz, 389 U.S. at 361).

Buelna claims that he has standing to challenge the search.[1] Buelna acknowledges that he did not have any ownership interest in the Miller house, but claims that the United States Supreme Court has held that one need not have a formal property interest in the premises to challenge a search. This statement is true. See Mancusi v. DeForte, 392 U.S. 364, 368 (1968) ("capacity to claim the protection of the [Fourth] Amendment depends not upon a property right in the invaded place but upon whether the area was one in which there was a reasonable expectation of freedom from governmental intrusion.").

Buelna cites Jones v. United States, 362 U.S. 257 (1960), in support of his claim that he has standing to challenge the search. In Jones, the court held that a visitor to a friend's apartment could challenge the search of that apartment. Id. at 267. However, the so-called "automatic standing" rule of Jones was subsequently overruled by the Court in

---

[1] As a matter of terminology, we have noted before that the United States Supreme Court has rejected the rubric of "standing" in the context of the ability of a defendant to challenge a search under the Fourth Amendment. See Allen v. State, 893 N.E.2d 1092, 1096 (Ind. Ct. App. 2008); Jackson v. State, 890 N.E.2d 11, 16 n.1 (Ind. Ct. App. 2008) (both citing Rakas v. Illinois, 439 U.S. 128, 140 (1978)). Instead, the definition of Fourth Amendment rights is more properly placed within the purview of substantive Fourth Amendment law than within that of standing. Jackson, 890 N.E.2d at 16 n.1 (citing Willis v. State, 780 N.E.2d 423, 427 (Ind. Ct. App. 2002)). Still, parties and courts often still refer to "standing" when discussing whether a particular defendant has the right to challenge a search. See Allen, 893 N.E.2d at 1097 n.4 (Ind. Ct. App. 2008).

United States v. Salvucci, 448 U.S. 83, 84 (1980). Moreover, even in Jones, the court noted that the Fourth Amendment does not protect those who are wrongfully on the premises and therefore cannot invoke the privacy of the premises searched. Here, neither Slabach nor Buelna had the consent of the owner to be staying in the Miller house; they simply had permission to work on the garage, and Slabach had permission to store tools in the house. In fact, Slabach, the only person with any rights concerning Miller's property, pleaded guilty to burglary of the house. See Tr. p. 98.

More recently, the Supreme Court has held that, although an overnight guest in another's home may challenge the search of the home, one who is merely present with the consent of the householder may not. Minnesota v. Carter, 525 U.S. 83, 90 (1998). Here, Buelna was present with the permission of Slabach, who himself did not have permission to reside in the house. Miller testified that Buelna did not have his permission to stay in the house and that he certainly did not give either Buelna or Slabach permission to manufacture methamphetamine in the house.[2]

Under the facts and circumstances before us, we can only conclude that Buelna has no standing to challenge the search of the Miller house. Miller owned the home, and Miller hired Slabach to work on the home. At no time did he ever give Slabach or anyone else permission to sleep or live in the attic, much less manufacture methamphetamine. Slabach therefore had no right to be on the property or doing what he

---

[2] Buelna's citation to the recent decision of our supreme court in Clark v. State, 994 N.E.2d 252 (Ind. 2013), is also unavailing. In Clark, a police officer confronted two men who were living in a rented storage unit. But the issue in that case was whether the police had a reasonable suspicion to conduct a Terry stop; it had nothing to do with the reasonable expectation of privacy in a searched premises.

was doing at the time of the search. Buelna, who Miller did not even recognize, certainly did not have Miller's permission to be in his house. Buelna was essentially a trespasser on Miller's property and cannot claim to have a *reasonable* expectation of privacy in the house.[3] See Fox v. State, 983 N.E.2d 1165, 1168-69 (Ind. Ct. App. 2013) (holding that defendant had no standing to challenge warrantless search of hotel room where defendant was located because, although the defendant was an invitee of the hotel manager, he was not a registered, overnight guest at the hotel and had just been in the room for the day).

Because we conclude that Buelna had no reasonable expectation of privacy, we need not address whether there were exigent circumstances to justify the search. But even if we assume *arguendo* that Buelna had standing to challenge the search, he would not prevail because we agree with the trial court that there were exigent circumstances present. In Holder, our supreme court agreed with those courts that have held that "a belief that an occupied residence contains a methamphetamine laboratory, which belief is found on probable cause based largely on observation of odors emanating from the home, presents exigent circumstances permitting a warrantless search for the occupants' safety." Holder, 847 N.E.2d at 939-40 (citing Kleinholz v. United States, 339 F.3d 674, 676-77 (8th Cir. 2003); United States v. Rhiger, 315 F.3d 1283, 1289-90 (10th Cir. 2003); United States v. Walsh, 299 F.3d 729, 734 (8th Cir. 2002); United States v. Wilson, 865 F.2d 215, 217 (9th Cir. 1989)). Here, the police detected the strong odor of ammonia, which is

---

[3] In his reply brief, Buelna argues that he had a subjective expectation of privacy. But this is not enough. As noted in Holder, whether Fourth Amendment protections should be applied embraces a two-part inquiry: (1) whether a person has exhibited an actual subjective expectation of privacy; *and* (2) whether the expectation is one that society is prepared to recognize as *reasonable*. Holder, 847 N.E.2d at 936 (citing Katz, 389 U.S. at 361). Here, the expectation of privacy is one that is not reasonable.

associated with methamphetamine manufacturing, and observed that someone was in the Miller house. Thus, even if Buelna had a reasonable expectation of privacy, the search was justified by the existence of this exigent circumstance. See Holder, 847 N.E.2d at 939-40.

In short, the trial court did not abuse its discretion in admitting the evidence seized during the search of the Miller house.

## II. Sufficiency of the Evidence

Buelna next claims that the State failed to present evidence sufficient to support his conviction for Class A felony manufacturing methamphetamine. When reviewing a claim that the evidence is insufficient to support a conviction, we neither reweigh the evidence nor judge the credibility of the witnesses; instead, we respect the exclusive province of the trier of fact to weigh any conflicting evidence. McHenry v. State, 820 N.E.2d 124, 126 (Ind. 2005). We consider only the probative evidence and reasonable inferences supporting the verdict, and we will affirm if the probative evidence and reasonable inferences drawn from the evidence could have allowed a reasonable trier of fact to find the defendant guilty beyond a reasonable doubt. Id.

The statute defining the crime of manufacturing methamphetamine provides in relevant part that "(a) A person who . . . knowingly or intentionally . . . manufactures . . . methamphetamine, pure or adulterated . . . commits dealing in methamphetamine, a Class B felony, except as provided in subsection (b)." Ind. Code § 35-48-4-1.1(a). Subsection (b) of this statute elevates the offense to a Class A felony if "the amount of the drug involved weighs three (3) grams or more[.]" I.C. § 35-48-4-1.1(b)(1). Buelna claims that

10

the evidence is insufficient to show that he was actually involved in the manufacture of the methamphetamine found in the house and that there was insufficient evidence to establish that the amount of the methamphetamine found weighed more than three grams.

The first of these arguments is easy to dispose of. Buelna notes that Slabach testified that Buelna was not involved with the manufacture of methamphetamine at the house. However, Pantoja testified that Buelna was directly involved in the manufacturing process. See Tr. p. 645 ("Joe [Buelna] was cooking methamphetamine"). Buelna now claims that "the motivation and persuasion of the Pantoja [sic] is relevant when evaluating her testimony." Appellant's Br. at 22. This is a bald request that we reweigh Pantoja's testimony and consider her to be less credible than Slabach. Of course, we will not do so. See McHenry, 820 N.E.2d at 126. Pantoja's testimony, when combined with the fact that Buelna was found alone in an active methamphetamine lab, is sufficient to prove that he was actually involved in the manufacture of the methamphetamine and not merely present at the scene.

We also disagree with Buelna that there was insufficient evidence to establish the amount of methamphetamine he manufactured. Buelna argues that because there was no finished, solid methamphetamine, the only evidence for weight was for the liquid found in one of the reaction vessel, which he admits weighed approximately thirteen grams. Citing Judge Vaidik's concurring opinion in Harmon v. State, 971 N.E.2d 674 (Ind. Ct. App. 2012),[4] Buelna claims that the use of the unit "grams" in the statute "indicates that it

---

[4] The author of this opinion was the author of the lead opinion in Harmon.

11

is the solid drug that is intended to be measured, not the liquid that is used to manufacture the drug." Id. at 683 (Vaidik, J., concurring).

We agree that Judge Vaidik's concurring opinion in Harmon raises some valid policy issues; in fact, the statute as written has the potential to punish those who have completed the manufacturing process and have a dry product less than those who have yet to complete the process and have a heavier, liquid product. But the statute as written punishes the possession of methamphetamine "pure or adulterated." And this court has held before that "where . . . the intermediate step is so near the end of the manufacturing process that the final product is present in the chemical compound, that substance qualifies as an 'adulterated drug' for purposes of our manufacturing statutes." Hundley v. State, 951 N.E.2d 575, 581 (Ind. Ct. App. 2011), trans. denied; see also Norwood v. State, 670 N.E.2d 32, 37 (Ind. Ct. App. 1996) (holding that the additional weight of water added to pure cocaine in the process of manufacturing crack cocaine may be considered when determining the weight of the cocaine); Traylor v. State, 817 N.E.2d 611, 620 (Ind. Ct. App. 2004) (holding that evidence was sufficient to establish that defendant possessed over three grams of methamphetamine where evidence showed that defendant was in the process of producing methamphetamine, and the product in the reaction vessel weighed well over three grams).

Here, there was evidence that the liquid in the reaction vessels contained the final product, i.e., methamphetamine. And there was evidence that this liquid weighed well in excess of three grams. Accordingly, the evidence was sufficient to support Buelna's

conviction for possession of methamphetamine, pure or adulterated, in an amount in excess of three grams.

### III. Appellate Rule 7(B)

Buelna lastly claims that his sentence is inappropriate. Even if a trial court may have acted within its statutory discretion in imposing a sentence, Article 7, Sections 4 and 6 of the Indiana Constitution authorize independent appellate review and revision of a sentence imposed by the trial court. Trainor v. State, 950 N.E.2d 352, 355-56 (Ind. Ct. App. 2011), trans. denied (citing Anglemyer v. State, 868 N.E.2d 482, 491 (Ind. 2007)). This authority is implemented through Indiana Appellate Rule 7(B), which provides that a court "may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." Id.

Still, we must and should exercise deference to a trial court's sentencing decision, because Rule 7(B) requires us to give 'due consideration' to that decision and because we understand and recognize the unique perspective a trial court brings to its sentencing decisions. Id. While we have the power to review and revise sentences, the principle role of our review should be to attempt to level the outliers, and identify some guiding principles for trial courts and those charged with improvement of the sentencing statutes, but not to achieve what we perceive to be a "correct" result in each case. Fernbach v. State, 954 N.E.2d 1080, 1089 (Ind. Ct. App. 2011), trans. denied (citing Cardwell v. State, 895 N.E.2d 1219, 1225 (Ind. 2008)). Our review under Appellate Rule 7(B) should focus on "the forest—the aggregate sentence—rather than the trees—consecutive or concurrent,

13

number of counts, or length of the sentence on any individual count." <u>Id</u>. The appropriate question is not whether another sentence is more appropriate; rather, the question is whether the sentence imposed is inappropriate. <u>Former v. State</u>, 876 N.E.2d 340, 344 (Ind. Ct. App. 2007). And it is the defendant's burden on appeal to persuade us that the sentence imposed by the trial court is inappropriate. <u>Childress v. State</u>, 848 N.E.2d 1073, 1080 (Ind. 2006).

Buelna was convicted of a Class A felony. The minimum sentence for a Class A felony is twenty years, the advisory sentence is thirty years, and the maximum sentence is fifty years. Ind. Code § 35-50-2-4. Here, the trial court did impose the statutory maximum of fifty years. The maximum possible sentences are generally most appropriate for the worst offenders. <u>Wells v. State</u>, 904 N.E.2d 265, 274 (Ind. Ct. App. 2009), <u>trans. denied</u>. This is not, however, an invitation to determine whether a worse offender could be imagined, as it is always possible to identify or hypothesize a significantly more despicable scenario, regardless of the nature of any particular offense and offender. <u>Id</u>. In stating that maximum sentences are ordinarily appropriate for the worst offenders, we refer generally to the class of offenses and offenders that warrant the maximum punishment. <u>Id</u>. But this encompasses a considerable variety of offenses and offenders. <u>Id</u>. We concentrate less on comparing the facts of this case to others, whether real or hypothetical, and more on focusing on the nature, extent, and depravity of the offense for which the defendant is being sentenced, and what it reveals about the defendant's character. <u>Id</u>.

Although the trial court did impose the statutory maximum sentence of fifty years, it also chose to suspend twenty of those years. Our supreme court has held, when reviewing the appropriateness of a sentence, appellate courts are not restricted to consider only the aggregate length of the sentence and may also consider whether a portion of the sentence is ordered suspended. Davidson v. State, 926 N.E.2d 1023, 1025 (Ind. 2010).[5] That is, there is a difference between a fifty year executed sentence and a fifty year sentence with only thirty years executed.

Considering the nature of Buelna's offense, we note that he was caught in an active and on-going methamphetamine lab in the attic of a house where he was trespassing. Both he and Slabach, instead of assisting Miller in the rehabilitation of the house, trespassed on it and used it to facilitate the dangerous activity of manufacturing methamphetamine They also did so in a residential area and produced strong enough fumes that neighbors could smell the associated odor of ammonia. Buelna also attempted to flee when the police arrived. None of this helps Buelna meet his burden of showing that his sentence is inappropriate.

Turning now to the character of the offender, we note that Buelna has a substantial history of delinquent and criminal behavior. His juvenile record includes adjudications for criminal mischief, burglary, and theft, and his adult criminal history includes four prior felony convictions and eleven misdemeanor convictions. His felony convictions

---

[5] Of course, "[t]his does not preclude a reviewing court from determining a sentence to be inappropriate due to its overall sentence length despite the suspension of a substantial portion thereof. A defendant on probation is subject to the revocation of probation and may be required to serve up to the full original sentence." Id.

15

include burglary, theft, resisting law enforcement, and maintaining a drug house in Michigan, and his misdemeanor convictions include failure to appear, driving while suspended, resisting law enforcement, check deception, false informing, criminal recklessness, and possession of marijuana. When shown lenience in the past, Buelna has not responded well; he has violated the terms of his probation four different times, once for escaping while on work release. According to the presentence investigation report, Buelna was even on probation at the time he committed the instant offense. Thus, Buelna is a repeat offender who has responded poorly when shown lenience and who was caught, while on probation, manufacturing methamphetamine in a house that he had no right to be in. Under these facts and circumstances, Buelna has not persuaded us that trial court's sentence of fifty years with twenty years thereof suspended is inappropriate in light of the nature of Buelna's offense and his character.

**Conclusion**

The trial court did not abuse its discretion in admitting evidence seized from the warrantless search of the house where Buelna was found because Buelna could have no reasonable expectation of privacy in the house. The evidence was sufficient to establish both Buelna's participation in the manufacture of methamphetamine at the house and to establish that Buelna manufactured more than three grams of pure or adulterated methamphetamine. Lastly, Buelna's sentence of thirty years executed and twenty years suspended is not inappropriate in light of the nature of the offense and the character of the offender.

Affirmed.

16

BRADFORD, J., and PYLE, J., concur.