## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

May 18 2017, 10:04 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Alexander L. Hoover
Nappanee, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Caryn N. Szyper
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Shane E. Weedling,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff*

May 18, 2017

Court of Appeals Case No.
50A03-1611-CR-2544

Appeal from the Marshall Superior Court

The Honorable Robert O. Bowen, Judge

Trial Court Cause No.
50D01-1509-F1-9

**Altice, Judge.**

## Case Summary

[1] Shane E. Weedling appeals the sixty-five-year sentence imposed after he pled guilty to murder. He argues that his sentence is inappropriate in light of the nature of the offense and his character.

[2] We affirm.

## Facts & Procedural History

[3] In September 2015, Weedling and his girlfriend, Krysti LaVanway, were living at a motel in Plymouth, Indiana with LaVanway's two-year-old daughter from a previous relationship, S.W. On September 18, 2015, LaVanway left S.W. in Weedling's care when she went to work. Between 9:18 and 10:07 a.m., Weedling and LaVanway exchanged a number of Facebook messages. In the messages, Weedling indicated that he was angry because S.W. had wet the bed and told LaVanway that S.W. needed to go live somewhere else because he was "done wit [sic] her." *Exhibit Volume*.[1] Weedling warned LaVanway that S.W. had been beaten and that the longer LaVanway took to get home, the "moor [S.W. would] get beat [sic]". *Id.*

[4] When LaVanway returned home at 11:45 a.m., she found S.W. unconscious with a bloody face and nose. Weedling told LaVanway to let S.W. sleep and not to take her to the hospital. Weedling also told LaVanway to say that S.W. had fallen in the shower and stated he could not go to the hospital because he

---

[1] We note that exhibits submitted by the State in advance of sentencing were not separately identified by exhibit number, nor is the Exhibit Volume paginated.

would be arrested. Hours later, LaVanway asked a neighbor for a ride to the hospital. S.W. arrived at the hospital at 2:21 p.m.

[5] Within ten minutes of S.W.'s arrival at the hospital, police were dispatched to investigate suspected child abuse. The doctor who examined S.W. informed Detective Leo Mangus of the Plymouth Police Department that S.W. was unconscious and in critical condition with bleeding on the brain that could lead to death. The doctor further stated that there were older bruises on S.W.'s body. Detective Mangus observed numerous injuries on S.W.'s body, including heavy bruising on her buttocks, bruising in the shape of fingers on her ribs, bruising on her legs and arms, a bloody injury on her head, and bleeding from her nose.

[6] LaVanway initially told Detective Mangus that S.W. had fallen in the shower and that Weedling was not home when the injury occurred. LaVanway consented to a search of her motel room, and upon his arrival at the room, Detective Mangus found Weedling asleep on the bed and a bag of marijuana on the nightstand. After some difficulty waking Weedling, Detective Mangus asked him what had happened. Weedling stated that he was in the other room when S.W. fell in the shower. Weedling and LaVanway were both transported to the police department for questioning, where they gave police conflicting accounts of what had happened to S.W. LaVanway eventually admitted that she was at work when S.W. was injured and that she had lied to try to protect Weedling. She also stated that Weedling told her that he had spanked S.W. with a hairbrush until it broke, and she believed that was how S.W. sustained

the bruising on her buttocks. During a search of the motel room, police located a broken hair brush and numerous bloodstained items, including a child's shirt with a large amount of blood on the front.

[7] S.W. never regained consciousness and died the next day as a result of devastating brain injuries. An autopsy indicated that S.W.'s death was a homicide as a result of multiple blunt force injuries to her head. S.W. had significant bruising all over her body in different stages of healing and massive bruising on the left side of her face causing her eye to hemorrhage and her retina to detach. S.W. had injuries to her buttocks, her forehead, her left cheek and ear, her mouth, her abdomen, her back, her wrist, her pelvic area, both of her knees, and her right foot. Her injuries were not consistent with a fall in the shower.

[8] On September 23, 2015, the State charged Weedling with Level 1 felony aggravated battery, Level 1 felony neglect of a dependent resulting in death, and Level 6 felony possession of marijuana. On October 29, 2015, the State amended the charging information to add a murder charge. On September 13, 2016, Weedling pled guilty to murder and the remaining charges were dismissed.[2] A sentencing hearing was held on October 6, 2016, at the conclusion of which the trial court imposed the maximum sentence of sixty-five

---

[2] LaVanway pled guilty to Level 1 felony neglect of a dependent. *See LaVanway v. State*, 59 N.E.3d 1100 (Ind. Ct. App. 2016) (memorandum decision), *trans. denied*.

years executed.  Weedling now appeals.  Additional facts will be provided as necessary.

## Discussion & Decision

[9]     Weedling seeks appellate revision of his sentence.  Article 7, section 4 of the Indiana Constitution grants our Supreme Court the power to review and revise criminal sentences.  *See Knapp v. State*, 9 N.E.3d 1274, 1292 (Ind. 2014), *cert. denied*, 135 S.Ct. 978 (2015).   Pursuant to Ind. Appellate Rule 7, the Supreme Court authorized this court to perform the same task.  *Cardwell v. State*, 895 N.E.2d 1219, 1224 (Ind. 2008).  Per App. R. 7(B), we may revise a sentence "if after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender."  *Inman v. State*, 4 N.E.3d 190, 203 (Ind. 2014) (quoting App. R. 7).  "Sentencing review under Appellate Rule 7(B) is very deferential to the trial court."  *Conley v. State*, 972 N.E.2d 864, 876 (Ind. 2012).  "Such deference should prevail unless overcome by compelling evidence portraying in a positive light the nature of the offense (such as accompanied by restraint, regard, and lack of brutality) and the defendant's character (such as substantial virtuous traits or persistent examples of good character)."  *Stephenson v. State*, 29 N.E.3d 111, 122 (Ind. 2015).

[10]    The determination of whether we regard a sentence as inappropriate "turns on our sense of the culpability of the defendant, the severity of the crime, the damage done to others, and myriad other factors that come to light in a given

case." *Bethea v. State*, 983 N.E.2d 1134, 1145 (Ind. 2013) (quoting *Cardwell*, 895 N.E.2d at 1224). Moreover, "[t]he principal role of such review is to attempt to leaven the outliers." *Chambers v. State*, 989 N.E.2d 1257, 1259 (Ind. 2013). It is not our goal in this endeavor to achieve the perceived "correct" sentence in each case. *Knapp*, 9 N.E.3d at 1292. Accordingly, "the question under Appellate Rule 7(B) is not whether another sentence is *more* appropriate; rather, the question is whether the sentence imposed is inappropriate." *King v. State*, 894 N.E.2d 265, 268 (Ind. Ct. App. 2008) (emphasis in original).

[11] In order to assess the appropriateness of a sentence, we first look to the statutory range established for the classification of the relevant offense. The sentencing range for murder is forty-five to sixty-five years, with an advisory sentence of fifty-five years. Weedling received the maximum sentence of sixty-five years. Our Supreme Court has explained that while "the maximum possible sentences are generally most appropriate for the worst offenders," this is not "a guideline to determine whether a worse offender could be imagined" as "it will always be possible to identify or hypothesize a significantly more despicable scenario." *Buchanan v. State*, 767 N.E.2d 967, 973 (Ind. 2002) (citations and quotation marks omitted). Thus, in reviewing a maximum sentence, "[w]e concentrate less on comparing the facts of this case to others . . . and more on focusing on the nature, extent, and depravity of the offense . . . and what it reveals about the defendant's character." *Wells v. State*, 904 N.E.2d 265, 274 (Ind. Ct. App. 2009), *trans. denied.*

[12] The nature of Weedling's offense is abhorrent. He brutally beat a defenseless two-year-old girl to death for wetting the bed. Weedling took a break from beating S.W. to send LaVanway Facebook messages telling her that he had beaten S.W. and would continue to do so until LaVanway came home. S.W.'s injuries were extensive, obvious, and devastating, but Weedling did not seek medical attention for her and tried to prevent LaVanway from doing so. Weedling also concocted a story about S.W. falling in the shower in an attempt to explain S.W.'s injuries. Moreover, S.W. had bruises in various states of healing, suggesting a pattern of ongoing abuse. Weedling's argument that "there was no clear evidence in the record that Weedling had knowledge or intent to murder S.W." is puzzling, given that Weedling pled guilty to knowingly killing S.W. *Appellant's Brief* at 11. *See also Appellant's Appendix* at 41 (information for murder charging Weedling with "knowingly kill[ing] another human being, to-wit: S.W."). There is ample evidence in the record to support a reasonable inference that Weedling knowingly killed S.W. To the extent that Weedling suggests that he committed the crime because he was under the influence of drugs, we note that he was lucid enough to send Facebook messages to LaVanway expressing his anger and his intent to continue beating S.W. until LaVanway got home and to fabricate a story in an attempt to hide his crime. In sum, the nature of the offense in this case supports the sentence imposed.

[13] Nor do we find anything significantly redeeming about Weedling's character. The crime itself speaks volumes about Weedling's character. Moreover,

Weedling has a significant criminal history. Weedling was twenty-three years old at the time of the murder, but he had already been convicted of three felonies: class D felony theft, class D felony possession of marijuana, and class B felony burglary. Weedling also had misdemeanor convictions for possession of marijuana and false informing and juvenile adjudications for possession of an alcoholic beverage, leaving home without parental permission, and public indecency. Weedling suggests that his struggles with substance abuse support revision of his sentence, but we note that substance abuse may properly be considered an aggravating circumstance. *See, e.g., Bryant v. State*, 802 N.E.2d 486, 501 (Ind. Ct. App. 2004) (concluding that eighteen-year-old defendant's history of substance abuse was properly considered to be an aggravating circumstance where the defendant had taken no positive steps to treat his addiction), *trans. denied*. Weedling told the probation officer who prepared his Pre-Sentence Investigation Report (PSI) that he had been referred for substance abuse treatment in the past, but felt that "drug and alcohol classes are pointless." *Appellant's Appendix* at 120. When asked whether he would attend substance abuse treatment, Weedling responded, "no, God has delivered me." *Id.* We do not see how Weedling's substance abuse reflects positively on his character, particularly in light of his continuing refusal to accept treatment.

[14] Finally, Weedling directs out attention to a letter his parents sent to the trial court indicating that Weedling had been participating in religious programming while incarcerated. According to Weedling, his "dedication to religious introspection" indicates that he "is attempting to come to grips with the

enormity of what happened while also attempting to make himself a better human being." *Appellant's Brief* at 11. However, our review of the record indicates that Weedling continued to minimize the seriousness of his offense even after his guilty plea. In a letter sent to the trial court on September 26, 2016, Weedling complained about the demeanor of the probation officer who prepared his PSI and indicated that he believed his charge should have been dropped to involuntary manslaughter because he never meant for any of it to happen. We note further that when asked how he felt about his crime, Weedling responded "horrible, [but] at the same time content cause God has forgiven me." *Appellant's Appendix* at 120. For all of these reasons, we cannot say that Weedling's sixty-five-year sentence is inappropriate.

[15] Judgment affirmed.

[16] Kirsch, J. and Mathias, J., concur.