## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

May 29 2019, 10:02 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Timothy J. Lemon
Knox, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Samantha M. Sumcad
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Matthew Schutz,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

May 29, 2019

Court of Appeals Case No.
18A-CR-2626

Appeal from the
Starke Circuit Court

The Honorable
Kim Hall, Judge

Trial Court Cause No.
75C01-1701-MR-1

**Kirsch, Judge.**

[1] Matthew Schutz ("Schutz") was convicted of murder[1] after a jury trial and was sentenced to sixty-five years. On appeal, he raises two issues, which we restate as:

> I.  Whether the State presented sufficient evidence to rebut Schutz's claim of self-defense; and
>
> II.  Whether Schutz's sixty-five-year sentence is inappropriate.

[2] We affirm.

## Facts and Procedural History

[3] On January 17, 2017, Laureen Schutz ("Laureen"), Schutz's wife, agreed to drive to Valparaiso with Keanna Knight ("Knight") to pick up Knight's fiancé, Bradley White ("White"). *Tr. Vol. 3* at 13-14. Knight was pregnant with White's child. *Id*. at 13, 53. Laureen and White were good friends, and Schutz was jealous of their friendship. *Id*. at 82. Knight and Laureen were accompanied on their drive to Valparaiso by Laureen Manns ("Manns"),[2] Emily Clemons ("Clemons"), and Sarah Orr ("Orr"). *Id*. at 18. During the drive, Laureen told Knight that she wanted White to fix things at her and Schutz's home, including a collapsed bathroom floor, an inoperative water pump, and damaged flooring, carpeting, and drywall. *Id.* at 15.

---

[1] *See* Ind. Code § 35-42-1-1.

[2] Manns is also referred to as "Lori" Manns. *Tr. Vol. 3* at 16.

[4] After they picked up White in Valparaiso, they drove to his mother's residence, where White had parked his Toyota pickup truck. *Id.* at 19. White retrieved tools from his pickup truck to make the repairs that Laureen had requested. *Id.* 19-20. White owned a two-inch pocket knife, which he often stowed above the visor or in the glovebox of his pickup truck or wore on his waistband. *Id.*

[5] Around dusk, White and Knight drove to Laureen and Schutz's home in North Judson. *Id.* at 21. They entered the home, where they found Schutz, Laureen, Clemons, Orr, and Manns. *Id.* Schutz greeted White with tears and a hug, saying, "Where have you been? I needed you a couple of days ago." *Id.* at 22. Everyone sat in the same small room. *Id.* Schutz had taken a large amount of Klonopin, an anti-anxiety medication, and Suboxone, a pain killer, before White and Knight arrived. *Id.* at 24, 82, 246.

[6] Schutz began arguing with Laureen about "Peggy," their former roommate. *Id.* at 23. After Peggy moved out of Schutz's home, she accused Schutz of trying to have "sneaky relations" with her. *Id.* Schutz was angry with Laureen because she had declined Schutz's request to arrange a phone call with Peggy's boyfriend, Corey. *Id*. at 23-24. Schutz wanted to assure Corey that he had made no sexual overtures to Peggy. *Id.* at 23. Schutz also wanted to remind Corey that he and Peggy owed Schutz money. *Id.*

[7] Eventually, Schutz directed his anger toward everyone in the room. *Id.* at 24. After White assured Schutz that Schutz could call Corey tomorrow, Schutz became angry with White for "butting in." *Id.* at 25. Schutz began threatening

everyone in the room. He screamed that by the end of the night, everyone would be "six feet under" and that he knew people who would come over to "shoot down the house." *Id*. at 26. Schutz directed several threats at White, saying, "How much do you want to bet that you will be six-foot [sic] under by the end of the night?" *Id*. at 27-28. Though angered, White remained calm. *Id.* at 28. White said he wanted to leave with Knight but decided to stay to protect Laureen and Orr. *Id.* at 29. Laureen also persuaded White and Knight to stay because they were her friends. *Id*. White tried to calm Schutz down and told Schutz that he still wanted to be Schutz's friend. *Id*. at 83-84. Later, Schutz and Laureen "got into a really high-pitched argument." *Id.* at 28.

[8] At one point, White tried to redirect the conversation toward his offer to make repairs to the home. *Id*. at 29. He went outside to retrieve tools, including a hammer. *Id.* at 29-30. When he re-entered the home, White offered the hammer to Schutz and asked Schutz if the hammer was needed to repair the water pump, but Schutz ignored White. *Id.* Schutz often taunted White, calling him a "mama's boy." *Id*. at 31. One of the times that Schutz said that "everybody would be six feet under," Schutz pointed directly at Knight. *Id*. As tensions between White and Schutz reached the boiling point, White tore off his shirt, which Knight interpreted as an aggressive gesture, but Knight and Clemons were able to calm White down. *Id*. at 30. White went outside to his pickup truck to retrieve another shirt and then re-entered the home. *Id*. Even though Schutz's verbal provocations angered White, he "took it in." *Id*. at 31.

[9] White went outside another time to defuse the situation. *Id.* at 32. While White was outside, Schutz went to a back room and returned wearing a hoodie with his hands tucked in the hoodie; he then pulled out a nine-inch hunter's knife that had a curved and serrated six-inch blade. *Id.* at 33. When White returned to the house, he did not have a knife or other object in his hand. *Id.* at 32. When White saw Schutz's knife, he told Schutz that Schutz was making him nervous and asked Schutz to put the knife away. *Id.* at 33. Schutz refused. *Id.* at 34. As Schutz and White slowly approached each other, Schutz said, "I could stab you in the heart right now," and White said, "Do it." *Id.* at 35. Laureen then jumped between Schutz and White. *Id.* at 34. Schutz was still holding his knife, but White was not holding his pocketknife as it remained hooked to his waistband. *Id.* at 36, 87. Moments after Laureen jumped between Schutz and White, Schutz swung the knife around Laureen and stabbed White in the upper right torso. *Id.* at 37. The knife made a loud popping sound as Schutz stabbed White with enough force to fully plunge the six-inch serrated blade into White's chest. *Id.* at 37, 229-30.[3] The knife perforated White's subclavian artery and nerves. *Id.* at 229. When Schutz removed the knife, blood began to spray from White's chest. *Id.* at 38. White stumbled out of the house and continued to stumble until he collapsed about two houses away from Laureen and Schutz's home. *Id.* An ambulance arrived

---

[3] Thomas Soziok, the forensic pathologist who performed the autopsy on White, testified that there was complete penetration of the entire knife blade all the way to the hilt because at the wound entry there was a bruise shaped like the hilt of the knife. *Tr. Vol. 3* at 230.

about fifteen minutes later and transported White to the hospital where White died. *Id.* at 39-41. An autopsy confirmed that the stab wound caused White's death. *Id*. at 231.

[10] On January 24, 2017, the State filed an information charging Schutz with murder under Indiana Code section 35-42-1-1(1), and on February 7, 2017 it filed an amended information. *Appellant's App. Vol. 2* at 17-18. Schutz's jury trial commenced on July 30, 2018, during which he raised a claim of self-defense. *Id.* at 12-13; *Tr. Vol. 3* at 66; *Tr. Vol. 4* at 35-36, 49, 58, 60, 100. The jury returned a guilty verdict on August 22, 2018. *Appellant's App. Vol. 2* at 12-13, 29; *Tr. Vol. 4* at 161-62.

[11] At the October 3, 2018 sentencing hearing, the State asked the trial court to impose the advisory sentence of fifty-five years for Schutz's murder conviction. *Tr. Vol. 4* at 187. Schutz asked the trial court to impose a sentence between forty-five and fifty-five years. *Id.* at 191. On October 3, 2018, the trial court imposed the maximum sixty-five-year sentence allowed by statute. *Appellant's App. Vol. 2* at 30-35. As mitigating factors, the trial court cited Schutz's mental illness; Schutz had been diagnosed with fourteen separate mental illnesses, including Explosive Disorder, Conduct Disorder, Paranoia, and Anti-Social Personality Disorder. *Id.* at 32-33. The trial court also cited Schutz's minimal criminal history as a mitigating factor. *Id*. at 31. Schutz's criminal record included two convictions from the State of New York, a 2002 felony battery conviction and a 2009 misdemeanor petit larceny conviction, a 2013 Starke County felony conviction for battery resulting in bodily injury to a person less

than fourteen years old, and a 2013 misdemeanor battery resulting in bodily injury charge that was dismissed. *Appellant's Conf. App. Vol. 3* at 6-7.

[12] The trial court found five aggravating factors. First, even though the trial court had found Schutz's mental illness was a mitigating factor, it found his refusal to seek voluntary treatment for his mental illness as an aggravating factor.[4] *Appellant's App. Vol. 2* at 32. Second, even though the trial court found that Schutz's criminal history was a mitigating factor, it found the fact that one of his crimes involved violence against a child was an aggravating factor. *Id.* Third, it cited Schutz's intentional abuse of prescription medication. *Id.* at 33. Fourth, the trial court noted Schutz's threats to the others the night of the murder. *Id.* at 34. Under this aggravating factor, the trial court also noted that Schutz killed White while White was unarmed. *Id.* Fifth, the trial court cited Schutz's lack of appreciation of human life as an aggravating factor, which the trial court concluded made Schutz "the most dangerous of all criminal defendants." *Id.* The trial court found that the aggravating factors outweighed the mitigating factors and imposed the sixty-five-year sentence. *Id.* Schutz now appeals.

---

[4] From the age of seven until nineteen, Schutz resided in mental health hospitals in the State of New York. *Appellant's Conf. App. Vol. 3* at 8, 10. We presume these were involuntary placements, but the record is silent on this.

# Discussion and Decision

## I.    Rebutting Schutz's Claim of Self-Defense

[13]    Schutz claims the State failed to rebut his claim of self-defense, contending that there "is substantial evidence in the record to show that Schutz acted in self-defense." *Appellant's Br.* at 8. He cites testimony from two defense witnesses, Laureen and Clemons, to support his argument. Schutz goes even further in arguing that there "was *no* evidence in the case to negate [Schutz's] claims of self-defense." *Appellant's Br.* at 6, 10 (emphasis added). Schutz, however, does not acknowledge the substantial evidence showing that he did not act in self-defense. Also, Schutz creates a misleading impression when he claims that all witnesses "indicated that [White] was armed with a hammer and his knives during the incident." *Id.* at 9. Orr testified that White was not armed. *Tr. Vol. 3* at 87. While Knight testified that White had his two-inch pocketknife with him during the evening of the incident, she testified that White never removed the pocketknife from his waistband and held it for use as a weapon. *Id.* at 36.[5]

[14]    Thus, Schutz ignores our well-settled standard of review, which requires us to review a challenge to the sufficiency of evidence to rebut a claim of self-defense

---

[5] Indiana Appellate Rule 22(C) requires that "[a]ny factual statement shall be supported by a citation to the volume and page where it appears in an Appendix, and if not contained in an Appendix, to the volume and page it appears in the Transcript or exhibits[.]" Schutz's statement of facts contains no citation to the Appendix or Transcript, and while Schutz provides citations to some factual assertions in his argument, twenty other factual assertions are not supported with adequate citations. In addition, Schutz does not provide citations to the Record to confirm that he did, in fact, raise a claim of self-defense at trial, the centerpiece of his trial strategy and this appeal. *See Galvan v. State*, 877 N.E.2d 213, 215 (Ind. Ct. App. 2007) (appeal dismissed for flagrant violations of the appellate rules).

the same way we review any claim of insufficient evidence. *Ervin v. State*, 114 N.E.3d 888, 895 (Ind. Ct. App. 2018), *trans. denied*.[6] We neither reweigh the evidence nor judge the credibility of the witnesses. *Id.* We consider only the probative evidence and reasonable inferences supporting the trial court's decision. *Id.* We will affirm a conviction if there is substantial evidence of probative value such that a reasonable trier of fact could have concluded the defendant was guilty beyond a reasonable doubt. *Id.*

[15] Indiana's self-defense statute provides:

> A person: (1) is justified in using reasonable force, including deadly force, against any other person; and (2) does not have a duty to retreat; if the person reasonably believes that the force is necessary to prevent or terminate the other person's unlawful entry of or attack on the person's dwelling, curtilage, or occupied motor vehicle.

Ind. Code § 35-41-3-2(d).

> To prevail on such claims, a defendant must show he: (1) was in a place where he had a right to be; (2) did not provoke, instigate, or participate willingly in the violence; and (3) had a reasonable fear of death or great bodily harm. When a claim of self-defense is raised and finds support in the evidence, the State bears the burden of negating at least one of the necessary elements.

---

[6] Ind. Appellate Rule 46(A)(6)(b) requires that the facts shall be presented in "accordance with the standard of review appropriate to the judgment or order being appealed."

*Ervin*, 114 N.E.3d at 896 (internal citations omitted).

[16] Here, the State rebutted Schutz's claim of self-defense by showing that Schutz did provoke, instigate, or participate willingly in the violence and that he did not have a reasonable fear of death or great bodily harm. *See Wilson v. State*, 770 N.E.2d 799, 800 (Ind. 2002). White came to Schutz's home to repair flooring, dry wall, and a water pump. *Tr. Vol.* 3 at 19-20. Soon after White and Knight arrived at the home, Schutz began threatening everyone present, claiming that before the end of the evening everyone would be "six feet under" and that he knew people who would come over to "shoot down the house." *Id.* at 26. Schutz shouted several of these threats directly at White, saying, "How much do you want to bet that you will be six foot [sic] under by the end of the night?" and "I could stab you in the heart right now." *Id.* at 28. He also provoked the situation by taunting White, calling him a "mama's boy." *Id.* at 31. White made several efforts to defuse the situation. He tried to steer the conversation toward topics that would not upset Schutz. *Id.* at 29. He stepped outside to ease tensions with Schutz. *Id.* at 31-32. Even when the argument became heated, White assured Schutz that he wanted to remain friends. *Id.* at 83-84. When Schutz brandished the hunting knife, White told Schutz that he was making him nervous and asked Schutz to put the knife away, but Schutz refused. *Id.* at 33-34. Moreover, this evidence establishing that Schutz provoked the confrontation also negates Schutz's claim that he did not willingly participate in the violence. *See Wilson*, 770 N.E.2d at 800.

[17]   The State also rebutted Schutz's claim that he had a reasonable fear of death or great bodily harm. *See id.* It did so, in part, through the evidence cited in the previous paragraph that shows that Schutz, not White, provoked the fight. Moreover, even when Schutz stabbed White, White had not reached for his pocketknife; it remained hooked on his waistband. *Tr. Vol. 3* at 36. Accordingly, the State presented sufficient evidence to negate Schutz's claim of self-defense, and we thus affirm Schutz's conviction for murder.

## II.   Inappropriate Sentence

[18]   Schutz also argues that his sixty-five-year sentence is inappropriate under Indiana Constitution Article VII, sections 4 and 6 and Indiana Appellate Rule 7(B). Indiana Appellate Rule 7(B) allows us to revise a sentence if, after due consideration of the trial court's decision, we find the sentence inappropriate considering the nature of the offense and the character of the offender. *Anglemyer v. State*, 868 N.E.2d 482, 491 (Ind. 2007), *clarified on reh'g*, 875 N.E.2d 218 (2007). The "nature of offense" compares the defendant's actions with the required showing to sustain a conviction under the charged offense, *Cardwell v. State*, 895 N.E.2d 1219, 1224 (Ind. 2008), while the "character of the offender" permits a broader consideration of the defendant's character. *Anderson v. State*, 989 N.E.2d 823, 827 (Ind. Ct. App. 2013), *trans. denied*.

[19]   We consider not only the aggravators and mitigators found by the trial court but also any other factors appearing in the record. *Johnson v. State*, 986 N.E.2d 852, 856 (Ind. Ct. App. 2013). We defer to the trial court's decision, and our goal is

to determine whether the appellant's sentence is inappropriate, not whether some other sentence would be more appropriate. *Conley v. State*, 972 N.E.2d 864, 876 (Ind. 2012). "Such deference should prevail unless overcome by compelling evidence portraying in a positive light the nature of the offense (such as accompanied by restraint, regard, and lack of brutality) and the defendant's character (such as substantial virtuous traits or persistent examples of good character)." *Stephenson v. State*, 29 N.E.3d 111, 122 (Ind. 2015). When we review a sentence, we seek to leaven the outliers, not to achieve a perceived correct result. *Cardwell*, 895 N.E.2d at 1225. When considering the nature of the offense, the advisory sentence is the starting point in our analysis. *Holloway v. State*, 950 N.E.2d 803, 806 (Ind. Ct. App. 2011).

[20] Under the nature of offense prong, Schutz claims his sentence is inappropriate because his crime is not among the worst of offenses. *See Buchanan v. State*, 767 N.E.2d 967, 973 (Ind. 2002); *see also Wells v. State*, 904 N.E.2d 265, 274 (Ind. Ct. App. 2009), *trans. denied*. He argues that "there was nothing particularly egregious about his conduct above and beyond what generally is necessary to establish these crimes." *Appellant's Br.* at 12. We disagree.

[21] Schutz's attack on the unarmed White was preceded by threats to everyone in the home, not just White, that by the end of the evening they would be "six feet under" and that he knew people who would come over to "shoot down the house." *Tr. Vol. 3* at 26. Schutz directed several threats at White, including, saying, "How much do you want to bet that you will be six foot [sic] under by the end of the night?" and "I could stab you in the heart right now." *Id*. at 27.

Schutz ignored White's pleas that he wanted to remain friends with Schutz. *Id.* at 83-84. When Schutz thrust the six-inch, serrated knife blade into White's torso, the force of the stabbing was so strong that the knife blade plunged its full six inches into White's torso, stopped only by the hilt of the knife. The wound was so severe that once the blade was removed, blood sprayed everywhere, and White collapsed moments later. Even though no murder is routine, Schutz's crime was especially grisly and showed a palpable disregard of human life. Thus, Schutz's crime was well beyond "what generally is necessary to establish these crimes." *See Appellant's Br.* at 12.

[22] Moreover, describing an offense as amongst the "worst" is not a guideline to determine if a worse offender could be imagined. *See Buchanan*, 767 N.E.2d at 973. It is always possible to hypothesize a significantly more despicable scenario. *Id.* Although maximum sentences are ordinarily appropriate for the worst offenders, we refer generally to the *class* of offenses and offenders that warrant the maximum punishment, and such a class encompasses a variety of offenses and offenders. *Id.* Under this standard, Schutz's offense qualifies as being among the worst of crimes. Schutz has not presented compelling evidence that depicts his crime in a positive light because his crime was not accompanied by restraint and lack of brutality. *See Stephenson*, 29 N.E.3d at 122. Schutz's sentence was not inappropriate in light of the nature of the offense.

[23] Schutz's sentence is also not inappropriate under the character of the offender prong. His criminal record includes a conviction for battery causing injury to a

child. *Appellant's Conf. App. Vol 3* at 6-7. Although Schutz's mental illnesses arouse sympathy, his refusal to seek treatment does not and does not attest to a virtuous character. *See Stephenson*, 29 N.E.3d at 122. Accordingly, Schutz's maximum sixty-five-year sentence is not inappropriate.

[24] Affirmed.

Vaidik, C.J., and Altice, J., concur.